JAMES & HAVERSTOCK, Appellants, v. F. R. DALBEY and ROXANNA DALBEY.

**Fraud.** Where the cost per foot was known, a false estimate made by an agent as to the cost of lightning rods is not sufficient to avoid a contract for their purchase for fraud, where the purchaser

had an opportunity to read the contract and did in fact look over the instrument as it was read to him by the agent.

**Duress.** A maker testified that he signed a note because the payee threatened to make it cost him his farm, and to prosecute him for obtaining money under false pretenses, and that he did not know whether he had done anything criminal or not. He was a man of intelligence, and was surrounded by his family, some of whom counseled against signing the note. None of the family seemed to have been much frightened, and his wife sought to have a constable called to arrest the payee. *Held*, that the note was not given under duress.

Same. A note given to avoid a civil suit and in compromise of a claim against the maker, is not void for duress.

**Estoppel.** One who signs a note after carefully reading it and having his attention called to the interest clause therein cannot be heard to say that the note bore no interest.

**Bills and Notes:** ALTERATION. An alteration of a promissory note after its execution by the insertion of the figure "6" which made it draw interest at that rate per cent. is not material where as executed the note bore interest from date and the law fixed same rate.

**Liens:** AGENCY. No lien can be established against the property of a married woman, on the theory of her husband's agency, for lightning rods erected upon her house and barn where she objected to their purchase and stated to her husband in the presence of the agent that if he entered into the contract he must pay for the rods with his own money, and at all reasonable times protested against their erection.

*Appeal from Hamilton District Court.*—Hon. B. P. Birdsall, Judge.

TUESDAY, JANUARY 31, 1899.

SUIT in equity upon a promissory note signed by F. R. Dalbey, and to establish and foreclose a mechanic's lien upon the property of Roxanna Dalbey. Defendant F. R. Dalbey pleaded that the note was obtained through fraud and duress, and that it had been materially altered since its execution. Roxanna Dalbey says that the improvement which was placed upon her property, to-wit, lightning rods, was without her consent and against her protest, and that her husband, F. R. Dalbey, had no authority from her to contract for the

improvement. The trial court dismissed the plaintiff's petition, and they appeal.—*Reversed.*

*D. C. Chase* and *J. B. Sweet* for appellants.

*A. N. Boeye* for appellees.

DEEMER, J.—The note in suit was given in compromise of a claim for lightning rods which were erected upon a house and barn belonging to Roxanna Dalbey. It appears from the evidence that Roxanna objected to the purchase of the rods, and that this objection was made known to the agent who took the contract for the improvements. She said to her husband, in the presence of this agent, that if he (the husband) entered into the contract, he must pay for the rods with his money. She knew the rods were being erected, but she at all reasonable times protested against it. Under such a state of facts, no lien can be established against her property. The idea that her husband was her agent for the purpose of making the improvement is clearly negatived. *Getty v. Tramel,* 67 Iowa, 288; *Young v. Swan,* 100 Iowa, 323.

But it is argued that there should be a recovery against the husband upon the note. This instrument was given in compromise of a claim made by Cole Bros. upon a contract or order for the erection of lightning rods. As both the note and contract bear the signature of F. R. Dalbey, they make a *prima facie* case for plaintiffs, who are indorsees of the note; and the burden is upon defendant to establish some of the defenses pleaded by him. These defenses are fraud in securing the note, duress, and a material alteration. The contract provides that defendant shall pay sixty-seven cents per foot for the rod, braces and elevations to be counted as twenty feet of rod each; and he agreed to settle for the same in cash, or by note due in three months without interest. The contract further provides that two hundred and five feet of

rod, and six points, six balls, and two vanes, should be furnished free of charge.

·It is claimed that this contract was obtained by fraud, and that the agent for Cole Bros. represented that the rods would cost but ten dollars and twenty-five cents, whereas the claim made when the work was completed was for a very much larger sum. Defendant is a school teacher, and is above the average in intelligence. He had an opportunity to read the contract, and did, in fact, look over the instrument as it was read to him by the agent. No claim is made that the agent misread it. The only fraud attempted to be proven is the false estimate made by the agent as to cost of the rods. This is not sufficient to avoid the contract. *Roundy v. Kent,* 75 Iowa, 662; *Reid v. Bradley,* 105 Iowa, 220; *Organ Co. v. Caldwell,* 94 Iowa, 584; *Jenkins v. Coal Co.* 82 Iowa, 618; *McKinney v. Herrick,* 66 Iowa, 414; *McCormack v. Molburg,* 43 Iowa, 561.

After the rods had been erected, another agent of Cole Bros. called upon Dalbey for the purpose of making settlement. A controversy arose between this agent and Dalbey as to the amount for which he (Dalbey) was liable, which was finally settled by the execution of the note in suit. It is contended that Dalbey did not sign the note of his free will, but through duress, caused by threats of prosecution for obtaining property under false pretenses. The evidence of Dalbey on this point is as follows. I signed the note about four o'clock. I told him I would not sign any note. I said, 'I won't sign any note; it is a damn swindle, and I won't sign any note.' He says, 'You will have to sign it.' I says, 'I won't do it.' He says, 'If you don't sign it, I will make it cost you your farm.' He says, 'I will prosecute you for getting goods under false pretenses.' He tore around like a man with his head off. My daughter and my wife and son were there. My wife took part in the conversation. I finally signed the note. It is the same note you

have referred to in controversy in this action.    Q.    The
property was all in her name, was it not?    A.    Yes, sir.    Q.
How did you understand that he was going to break you up,
if she had nothing to do with the contract?    A.    I knew it
would call out litigation.    I was not so much afraid of that
as I was of the other, because I did not know whether I had
done anything wrong or not in signing that contract,—
whether I had done a criminal act or not.    Of course, he got
me considerably rattled.    I didn't know much of anything
along the last of it.    This note was signed at four o'clock,
and he had put the rods on at noon."    Mrs. Dalbey testified as
follows: "They were at the barn quarreling.    He wanted
him to sign a note for the amount he asked for the rods, and
they wouldn't do it.    He threatened to take it up.    He said
he had broken more than one farm.    He said he would make
it cost us twice as much.    I stayed there until he left, about
four o'clock.    I was there about three hours.    McCann threat-
ened to prosecute my husband for getting something under
false pretenses.    I ordered him to take down the rods, and
take them away, and he said he didn't have to.    I wanted my
son to go after the constable to arrest him.    Q.    This man told
you, when he was there making threats, that he could file a
lien on the place, didn't he?    A.    Yes, sir.    Q.    That was
the only threat he made?    A.    Yes, sir.    He said he would not
take a lien if he would sign the note.    Q.    Now, if you had
tried very hard, Mrs. Dalbey, you could have made these fel-
lows quit?    A.    What can one woman do with those desperate
fellows?    I did not see him have any revolver, but the motions
were just as good.    I guess he was armed.    My son was there
all the time.    My husband was not afraid of him personally."
The daughter said:    "A.    Was down to the barn before the
note was signed.    McCann threatened prosecution, and to
break them up, and make them trouble.    My mother wanted
my brother to go for the constable, and have them arrested.
I think my father was in fear.    He trembled and turned pale.
The man threatened to put a lien upon the place."    The son

testified as follows regarding this issue: "McCann (the agent) said, he would have to pay for them; that it would cost him more than his farm was worth. McCann did not know anything about the circumstances of the farm at that time. McCann also told him that he would have him arrested for getting property under false pretenses. My mother told him not to sign the note; said she would not pay any such price for the rods; to take them down, and get away from there. She told him the place was hers, and she was the boss of it. She wanted me to go after the constable, and have them arrested." The agent who took the note denied making any threats, save that he would or could file a mechanic's lien against the property; and another witness testifies to certain conversations with Dalbey which negative any idea that threats were made against him.

Now, duress is defined to be "an actual or threatened violence or restraint of a man's person, contrary to law, to compel him to enter into a contract, or to discharge one." *King v. Williams,* 65 Iowa, 167. And it must be that degree of constraint or danger, either actually inflicted or threatened and impending, sufficient to overcome the mind and will of a person of ordinary firmness. *Brown v. Pierce,* 7 Wall. 214. And the act which the party seeks to avoid must have been done by him through fear of such threatened arrest. *Flanigan v. City of Minneapolis,* 36 Minn. 406 (31 N. W. Rep. 359). The question of duress is ordinarily one of fact, and it must be shown that the will of the person was constrained thereby. *Dunham v. Griswold,* 100 N. Y. 226 (3 N. E. Rep. 76). We have already observed that Dalbey is a man of more than ordinary intelligence. At the time he gave the note he was surrounded by the members of his family, some of whom counseled with him regarding the effect of the note. Neither the wife nor the children seem to have been very much frightened, and the wife sought to have a constable called to arrest the agent. No doubt Dalbey thought he would have litigation

if he refused to sign the note, but he knew very well that he was not guilty of a crime. We are constrained to believe that he gave the note to avoid a civil suit, and in compromise of the claim against him. This falls far short of duress. The act of making the note may have been ill-advised, but it was not given through duress.

II. Further, it is said that the note was materially altered after its execution, by the insertion of the figure "6," which made it draw interest at that rate per cent., whereas the note as originally given bore no interest. As given, the note read: "One year after date,     *     *     *     I promise to pay Cole Bros., or bearer,     *     *     *     with interest from date until paid, the sum of one hundred and fifty dollars, at the rate of ———— per cent. per annum." The alteration was by inserting the figure "6" in the blank space. Appellants contend that this was not a material alteration, because the note drew six per cent. interest in any event. It is a commonplace that an alteration, to avoid a note, must be material; that is, it must so change the legal effect of the instrument as to make it express a promise different from that which the parties in fact made. *Rowley v. Jewett,* 56 Iowa, 492; *Robinson v. Insurance Co.* 25 Iowa, 430. If the law would have supplied the matter introduced into the writing, such insertion will not be deemed a material alteration. 2 Daniel Negotiable Instruments, section 1398; *Bank v. Wolff,* 79 Cal. 71 (21 Pac. Rep. 551). As executed, the note bore interest from date, and the law affixed the rate, to-wit, six per cent. Adding the figure 6 in the blank did not, therefore, change its legal effect.

Claim is made, however, that the agent who took the note represented that it should draw no interest, and that he also stated that the note, as written, did not bear interest. Appellee read the note over very carefully before he signed it, and his son called attention to the interest clause of the note. After some discussion Dalbey signed it, knowing full well the terms thereof. Having so

signed, he cannot now be heard to say that the note bore no interest. See authorities first above cited.

As F. R. Dalbey has failed to make out any of the defenses pleaded by him, there should have been judgment against him for the amount of the note in suit, and the cause will be remanded for that purpose.—REVERSED.