## Northern Coal & Coke Company v. Bates, et al.

(Decided February 7, 1912.)

### Appeal from Letcher Circuit Court.

1. Contracts—Specific Performance—Rescission.—Before a court will rescind a contract upon the ground that it was procured by fraud, the proof must be strong and convincing, and the case a clear one.

2. Contract—Printed and Written Provision.—Where, in the use of a printed form, a contract is partly printed and partly written, and there is a conflict between the printing and the writing, the writing will prevail.

3. Pleadings.—Where the petition alleges that the contract sued on had been assigned to the plaintiff, and that allegation is not denied by the answer, the assignment stands confessed by the answer, and cannot be reviewed upon appeal.

HAGER & STEWART, SALYER, BAKER & WAKEFIELD and SMITH & COMBS for appellant.

S. B. DISHMAN, E. E. HOGG and R. O. BRASHEARS for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing upon the Appeal and Cross-Appeal.

On June 18, 1903, appellee, William J. Bates, and his wife, entered into a written contract with the Dun-

can Coal & Iron Co., whereby they sold to said company all the coal under their farm, "containing 300 acres, more or less," in Letcher county, for $2.50 per acre, $300.00 of the price having been paid in cash at the time the contract was made. As assignee of the Duncan Coal & Iron Co., the appellant brought this suit on October 26, 1905, for a specific performance of the contract. The appellees answered, and charged that the writing was procured by fraud, and does not correctly represent the contract between the parties. Appellees further answered, that they were unwilling to carry out the true agreement between the parties, but alleged that they were willing to refund the $300.00, with interest, and asked that the contract be canceled. They have not shown their willingness, however, to refund the $300.00 by paying it into court.

The chancellor not only denied the plaintiff any relief, and dismissed its petition, but he canceled the contract and required Bates to refund the $300.00, with interest, for which a lien was adjudged against the coal in Bates' land; and from the judgment dismissing its petition the company prosecutes this appeal, and Bates has prosecuted a cross-appeal from so much of the judgment as gives a lien for the $300.00.

The contract was drawn upon a printed form generally used by the Coal Company, whereby the grantor sells "all the coal, minerals and mineral products, the oils and gases, all salt minerals and salt water, fire and potters clay, all iron and iron ore, all stone, and such of the standing timber as may be, or by the grantee be deemed necessary for mining purposes, and including timber necessary for railroads or branch lines thereof, that may hereafter be constructed upon the said lands, and the exclusive right of way for any and all railroads and ways and pipe lines that may be hereafter located on said property by the said grantee, its successors or assigns, etc."

There are many other subsequent provisions in the printed portion of the contract, including the right of the grantee to erect buildings and structures necessary to the exercise of the rights and privileges granted; free access to said land for the purpose of surveying and prospecting the same, and a reservation to the grantor of all the timber upon the land, except such as may be necessary for mining, and the purposes above mentioned.

It further requires the grantor to furnish a com-

plete abstract of his title, and that the payment of the deferred purchase money is to be made when the grantor, at his own expense, shall have furnished a survey of a competent civil engineer showing the number of acres contained in the tract. The description of the land was written with pen and ink, and is followed by this clause, which is also written in like manner: "It is understood and agreed that grantor conveys no timber, and coal only is to be conveyed in this agreement. All expenses of surveying and abstracting is to be paid by grantee. It is understood and agreed that no miners' houses or coke ovens are to be built on this tract of land. No tram roads are to be built on this land, or railroad. No surface beyond what is necessary for mining and utilizing said coal is to be damaged by grantee by prospecting."

For specific acts to sustain the charge of fraud, appellees allege that they sold the coal only, with the right to prospect only, and that plaintiff was to take it from the other side of the mountain, in which plaintiff owned the mineral rights, in such a way as not to come upon appellees' land at all; that they sold the coal under only 150 acres of land, and not under the entire farm of "300 acres, more or less," as described in the contract; that what is known in the record as the "surface clause" written with pen and ink, and providing that "no surface beyond what is necessary for mining and utilizing said coal, is to be damaged by grantee by prospecting," was inserted by the fraud of the agents of the Coal Company; that appellee's eyes were bad; that the contract was not read over to him, or by him, before he executed it; and that the draftsman failed to strike out the last half of the first printed page of the contract.

The evidence shows, beyond a doubt, that Bates, after having read this printed contract or a similar one, objected to certain provisions thereof; and after striking out the provisions which carried a sale of anything other than coal, by running the pen through them horizontally across the printed lines of the paper, they added the pen and ink provisions above copied, for the purpose of fixing the rights of the parties in other respects, and wherever these pen and ink provisions conflicted with the unerased portions of the printed matter, the pen and ink provisions should control. The printed portion of the contract hereinbefore quoted was erased in part, in the manner above indicated, so that after the

correction, Bates sold "all the coal and the exclusive right of way for any and all railroads and ways and pipe lines that may hereafter be located on said property by the grantee, its successors, etc." Bates contends, however, that all the subsequent portion of the contract, beginning with the words "and the exclusive right of way," were stricken out by two cross lines of the pen drawn from those words diagonally to the bottom of the page, and that the contract as finally made between the parties consists of a sale of the coal for the price named, with the grantee's rights thereto fixed by the pen and ink provisions above quoted, with the exception of the surface clause, which he contends was fraudulently interpolated. Bates produced what he contends is a copy of the contract, with the lower portion erased, as above indicated; and he says it was the copy given to him by Vaughn when the contract was made.

Not only are the charges of fraud made by Bates not sustained by the evidence, but it clearly shows that there was no fraud in the making of the contract. The contract was made by Bates in the presence of Vaughn, Johnson and Chandler, and all of them contradict him in every material feature of his evidence.

Furthermore, the contract itself strongly corroborates the contention of Vaughn, Johnson and Chandler, that the written clauses of the contract were used, insofar as they applied, to correct the printed portions of the contract, which were used as a basis for the corrections. For instance, the printed contract conveyed such timber as might be necessary for mining, and the other purposes of the contract; the first pen and ink exception canceled that provision, by providing that Bates conveyed no timber, and that coal only was conveyed by the agreement. Again, the printed portion of the contract provided that Bates should furnish the abstract and survey of his property, at his own expense; the second written exception requires the Coal Company to bear these expenses. Furthermore, the printed contract gave the Coal Company the right to erect all such buildings and structures on said land as might be necessary or convenient to the exercise and enjoyment of the rights and privileges conveyed; while the third written exception expressly provides that no such house or coke ovens were to be built on the land. The printed portion further provided that the Coal Company could build all

railroads and ways that might be necessary to carry out the contract; the fourth written exception excludes these tramways and railroads. And finally, the printed contract gave "the right to enter upon said lands, use and operate the same, and the surface thereof, and make use of, and for this purpose divert water courses thereon, anything and every one that may be necessary or convenient for mining, and therefrom remove or utilize the product from said minerals, etc."; while the fifth pen and ink provision provides that no surface beyond what is necessary for mining and utilizing said coal is to be damaged. The printed provisions of the contract gave the grantee the right to use the surface of the land for the purpose of utilizing and transporting minerals and mineral products, oils and gases, salt minerals and salt water, fire and potters clay, iron and iron ore, and stone and timber necessary for mining; while the fifth written exception above referred to, confines the right of the grantee to the surface of what is necessary for mining and utilizing coal only.

It will thus be seen that every material provision of the written portion of the contract, which Bates claims was erased, was, in fact, nullified by the written provisions, under the well established rule of construction, that where, in the use of a printed form, a contract is partly printed and partly written, and there is a conflict between the printing and the writing, the writing will prevail. (9 Cyc, 584.) The legal effect of the contract under Bates' contention is practically the same as that contended for by appellant, with the addition of the "surface clause," which Bates claims should be eliminated.

Turning now to the oral testimony, we find that Bates stands alone in his contention as to the making of the contract. He says he sold only 150 acres of his land around the top of the ridges, reserving the lower or bottom land whereon his house was situated. It appears, however, that on the evening the contract was made, Vaughn, Johnson and Chandler passed the night at Sam Hart's residence, several miles beyod Bates' residence. Bates followed them to Hart's residence, reaching there shortly after night-fall, and claims that he went there to get them to correct the contract so as to show that he had sold the coal under only 150 acres around the top of the ridge. In this he is flatly contradicted by Vaughn, Johnson, Chandler and Hart, who

say that Bates' only conversation was that his wife had complained because he had failed to reserve 12 or 15 acres of the bottom immediately around the house, and that he wanted the contract changed so as to make that reservation. Furthermore, these four witnesses are corroborated by the testimony of Mrs. Grace, a neighbor of Bates, who says she saw Bates as he was starting to Hart's, and that he said he was going there to get Vaughn to change the contract so as to reserve the few acres around the house to satisfy Mrs. Bates. If Bates sold the coal under only 150 acres, the purchase money would amount to only $375.00, and he had already received $300.00. It is hardly probable that the purchaser would have paid substantially all of the purchase money without having selected the half of the land that he was to get.

Furthermore, a day or two after the sale, Bates went to see John W. Hale, an attorney of Whitesburg, and said the Coal Company had bought his coal at a price he could not afford to take; and he asked Hale if there was any way to get out of it. Bates also asked Hale if he could get out of it by deeding the land to one of his boys; and Hale said if he had already done so before the sale had been made to the Coal Company, it might let him out; whereupon Bates said he had already conveyed it to his son Alphonso. The sale to the Coal Company had been made on June 18. On June 20 Bates went to another attorney, and got him to draw a deed conveying 150 acres of land to his son Alphonso. He dated the deed June 17; acknowledged it on June 20, and had it recorded. But evidently this was a mere subterfuge to defeat the sale to the Coal Company, by dating the deed one day anterior to that sale, so that it might appear that the deed to Alphonso was made before the sale to the Coal Company on the 18th. This, however, availed him nothing, since the date of a deed is the date of its acknowledgment, which, in this case, was after the sale to the Coal Company. Furthermore, during the progress of the case Alphonso reconveyed the property to his father, and it needs no further discussion. We only refer to it to show that it corroborates Vaughn, John and Chandler as to the contract, and furnishes additional evidence to the discredit of Bates.

Bates was only 47 years old; and, although he claims to have had little education, his testimony clearly shows that he was a man of more than average intelligence.

He claims that his eyes were sore, and that he could not read quickly or fast. He admits, however, that he read the contract over before he signed it, and the other witnesses who were present at the time say he not only read the contract over, but that Vaughn also read it over to him more than once.

It is insisted, however, that the contract was for a wholly inadequate consideration, and that it sustains the charge of fraud. The testimony does not sustain this claim. The weight of the testimony clearly shows that while the Coal Company had paid, in one instance, as much as $10.00 per acre for all the mineral rights in land in that neighborhood, the prevailing price of all the minerals was from $6.00 to $8.00 per acre—the price gradually rising as sales were made. It stands uncontradicted, however, that there is a difference of from $4.00 to $5.00 per acre between the price of all minerals in land, and the price of coal only; and, in the case at bar, the plaintiff sold only his coal.

Before a court will rescind a contract upon the ground that it was procured by fraud, the proof must be strong and convincing, and the case a clear one; and as the evidence is this case wholly fails to reach that dignity, the appellee failed to sustain his defense.

It is further insisted that the record fails to show that the contract was assigned by the Duncan Coal & Iron Co. to the appellant. The petition, however, alleges that there was such an assignment, and that allegation is not denied by the answer. On the contrary, the answer alleges that while the contract was made in the name of the Duncan Coal & Iron Co., it was really made for the benefit of the Northern Coal & Coke Co. The question of the assignment, therefore, stands confessed by the answer, and is not before us.

The circuit court should have dismissed the counter-claim, and specifically enforced the contract.

Judgment reversed upon the appeal, and upon the cross-appeal, with instructions to enter a judgment specifically enforcing the contract, filed with the petition, giving the written portions controlling force over the printed portions. The appellant will recover its costs upon this appeal.