## Haag & Brother, et al. v. Damon Manufacturing Co.

(Decided May 21, 1913.)

### Appeal from Henderson Circuit Court.

Finding of Chancellor—Evidence—Sufficiency.—In an action on a contract the evidence examined and held sufficient to sustain the finding of the chancellor in favor of the plaintiff.

VANCE & HEILBRONNER for appellants.

YEAMAN & YEAMAN and GUY H. HERDMAN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

The Damon Manufacturing Company was the owner of an invention known as the "Missing link," a contrivance used in mills for the purpose of improving the quality of flour. On November 23, 1909, it entered into a contract with F. Haag & Brother, by which it assigned and transferred to them the exclusive right to manufacture and sell the machine for a period of four years in that portion of the United States of America lying west of the Mississippi river and including the States of Minnesota, Wisconsin, Illinois, Missouri, Arkansas and Louisiana. F. Haag & Brother were also given the exclusive right to manufacture and sell the machine for a period of eight years in Great Britain, France, Germany and Austria-Hungary. In consideration of the grant F. Haag & Brother were to pay the Damon Manufacturing Company a royalty of $10 upon each machine sold by them in the territory allotted to them in the United States, with the further provision that the minimum royalty in the United States should not be less than $208.33 1-3 per month. For the four European countries the royalty was to be $5 per machine sold, but not

less than $41.66 2-3 per month for each of those countries.

Haag & Brother paid the royalties for the month of December, 1909, but declined to make any payments for the three succeeding months of January, February and March, 1910. The Damon Manufacturing Company brought this suit to recover the royalties for those three months, amounting to the sum of $1,125. Defendants pleaded that they were induced to enter into the contract by the following fraudulent representations of W. E. Damon, the president of the Damon Manufacturing Company: (1) That the "Missing link" was the only invention or machine of the kind in existence or upon the market, and that in the manufacture of flour from wheat it would whiten the flour, produce an even granulation, good color and body, and increase the yield of flour from the grain. (2) That the "Missing Link" had no competition in the market of any kind. (3) That the territory mentioned in the contract was a new field, unexplored, and had not been worked or canvassed for the sale of said machine or invention. (4) That the plaintiff had applied to the United States Government for a patent upon the said invention in the United States and that the same had been granted and that application for a patent would be made at once to great Britain, France, Germany and Austria-Hungary. The answer then proceeds to state that these representations were false and untrue, and that defendants relied upon them, and would not have executed the contract unless they had believed that the representations were true. The answer further pleads that at the time the contract was made W. E. Damon agreed with the defendants to look after the installation of machinery in the mills and to direct the location of said machines in said mills; that this part of the agreement was omitted from the contract by the draughtsman thereof by oversight or mistake; and that said Damon had failed and refused to comply with this provision of the contract.

Proof was taken, and on final submission the chancellor gave judgment in favor of plaintiff. From that judgment the defendants appeal.

It appears from the evidence that Mr. Damon, who at one time had rendered some assistance to Mr. Haag in a libel suit pending against the latter, called on Mr. Haag at Henderson and suggested the advisability of his buying the territory in question and organizing a

company to manufacture and sell the "Missing link."
Negotiations pended for some time. Mr. Damon and the
Messrs. Haag discussed the merits of the invention, and
Mr. Damon submitted to them numerous recommenda-
tions from millers who had used the machine. Mr. F.
Haag went to Bowling Green and saw the machine in
operation at Auburn and Smith's Grove and talked with
the millers about it. A proposed contract was first
drafted by defendants' attorneys. This was submitted to
Mr. Damon, but he refused to sign it because the contract
stated that a patent had been obtained, whereas it had
only been applied for. There were also other objection-
able features. Finally, after five or six weeks, the con-
tract sued upon was executed. After the contract was
entered into defendants proceeded to put the machine
on the market. They employed some four or five men
for this purpose. The majority of them were not well
qualified for the work. Some time later Mr. Damon
suggested to them the propriety of their employing a
man and training him for the work of installing the
machines, as he still had the eastern part of the United
States and would necessarily be away from home a con-
siderable portion of the time and his absence would in-
terfere with their proper installation. Some weeks later
the defendants became dissatisfied with their contract.
Their evidence is to the effect that their salesmen found
that the territory which they canvassed had already been
canvassed, and that the "Missing link" did not come up
to the representations made by Mr. Damon. They also
say that he misrepresented the number of mills in the
territory which they had bought. In addition to this
evidence, there was evidence of the fact that there were
other machines on the market which did the same work
as the "Missing link," and were considered more satis-
factory. This character of evidence came principally
from competitors. The Messrs. Haag also say that at
the time the contract was entered into Mr. Damon agreed
to look after the installation of the machines, but there-
after declined to carry out this part of the contract. On
the other hand, the evidence for the plaintiff is to the
effect that the "Missing link" when properly installed
was a great success. A number of millers who had used
the machine say that it gave great satisfaction. Plain-
tiff's witnesses also say that while there were certain
machines on the market designed to do the work of the
"Missing link," they worked entirely on a different plan

and did not accomplish the same results. It is also shown that when the contract was entered into defendants were furnished with copies of the literature prepared by the Damon Manufacturing Company, and that this literature contained numerous recommendations from different millers in the territory assigned. It was also shown that the machine was a good seller in the hands of a competent salesman. As a matter of fact, a patent for the machine had been applied for in the United States, and was approved in the month of December, and was granted the following July. Patents were also granted in Great Britain, France and Germany. In discussing the question of the installation of the machines Mr. Damon said that he did not want anybody to do that work but himself, but that he wanted them to take Mr. Henry with a view to training him so he could do it. This, however, was not a part of the contract, and was not intended to be embraced in the .contract. The defendants knew at the time that he had other territory which he would have to look after, and on that account he suggested the necessity of their getting a competent man to install the machines. He never at any time refused to instruct such a man, but continually insisted on their getting a man. He did write that he would be out on the road a good deal, and advised them to get a competent man. Later he received a letter from the defendants referring to the fact that he wished to be relieved of the responsibility and care of that part of the business. He did not intend to refuse to look after the installations by that letter, and, as a matter of fact, did look after the intallations after that time. Before entering into the contract he wrote the Messrs. Haag as follows: "We think we note you are unnecessarily tenderfooted and would suggest that if you have any lingering doubts as to the advisability of entering into a four year's contract, binding yourself to pay a beggarly pittance of $10 on a thousand machines, minimum, then you take the same territory on a commission basis of 50 per cent, put your men in the field for three to six months, and then if your experience will not justify you in entering into the contract, you need not do so." It appears that the original contract drawn up by the attorneys for the defendants had in it a recital to the effect that a patent had been granted, and on this account the contract was rejected by the plaintiff. The contract finally executed simply recited that a patent had been

applied for. This recital brought home to the defendants the fact that a patent had not been granted, and there was therefore nothing in the contention that any false misrepresentations had been made on this point. The representations as to the territory being unexplored are substantially true. It is not shown that any of the territory had been canvassed except Missouri, a small part of Illinois and the city of Milwaukee. That defendants knew that this part of the territory had been canvassed there can be no doubt. There were laid before them the recommendations of various millers who had used the machine. The very fact that the machines were in use in that territory was sufficient to apprise them that the territory had been canvassed. Upon the question of competition there is considerable conflict of testimony. It is shown that there were certain scroll machines in use. There was no representation that there were no such machines. On the contrary, one of the pieces of literature referred particularly to that class of machines. It is likewise true that the weight of evidence is to the effect that these machines operated upon a different plan and did not produce as satisfactory results as the "Missing Link." Here, then, we have a case where every opportunity was given to the defendants to investigate the merits of the machine before the contract was entered into. They not only read the literature and recommendations presented by Mr. Damon, but they actually visited certain mills where the machines were in use. and not only saw them in operation, but inquired of the millers as to the results obtained. In addition to this, they were offered the opportunity of taking the territory upon a commission basis of 50 per cent, and then deciding, after an experience of three to six months, whether or not they would enter into the contract. Upon the whole it seems to us that the weight of evidence is to the effect that no fraudulent representations were made by Mr. Damon, but that the contract was entered into only after the defendants had actually made a satisfactory investigation as to the merits of the machine and had been given full opportunity to determine for themselves whether or not they would enter into the contract.

But it is further contended that Mr. Damon agreed to look after the installation of the machines, but failed to do so, and that this provision of the contract was omitted therefrom by fraud or mistake. That he agreed

to assist them in this respect there can be no doubt. It is the rule, however, that where it is claimed a portion of a contract was omitted by mistake, the evidence of mistake must be clear and convincing. Western Mfg. Co. v. Cotton, 126 Ky., 752; Livermore v. Middlesboro Town Lands Company, 106 Ky., 163; The Chicago Building Mfg. Co. v. Beaven, 149 Ky., 273.

The evidence in this case that Mr. Damon promised to assist the defendants in the installation of the machines and to instruct its men employed for that purpose was intended to be a part of the contract is by no means satisfactory. We are inclined to think that he was interested in the success of defendants and in the success of the machine, and as far as he could do so he wanted to look after the installation of the machines. But the evidence does not justify the conclusion that he actually entered into an agreement to do so and this agreement was omitted from the contract by mistake. Indeed, on the whole case, we think the evidence fully sustains the finding of the chancellor.

Judgment affirmed.