## Fairbanks-Morse & Company v. Manning & Combs.

(Decided May 4, 1915.)

### Appeal from Clay Circuit Court.

1.  Contracts—Trial.—In a suit on a written contract, the lower
    court erred in overruling demurrer to answer which set up con-
    temporaneous oral contract relative to the same subject matter
    as a basis of counter-claim, and also erred in permitting oral tes-
    timony in support of the alleged contemporaneous oral contract.
2.  Contracts—Evidence.—Where parties have deliberately reduced
    their engagements to writing in such terms as to make it a com-
    plete contract, it is conclusively presumed that the whole engage-

ment, and the extent and manner of the undertaking was reduced to writing; oral testimony of colloquium, conversations or declarations at the time when it was completed is incompetent, because it tends to substitute a different contract for the one really agreed upon.

A. D. HALL and OTIS H. FISK for appellant.

A. T. W. MANNING and D. K. RAWLINGS for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

This is a suit in equity on a lien debt by Fairbanks-Morse & Company, and they appeal from a judgment rendered against them by the chancellor on a counter-claim for damages in the net sum of $674.36.

The damages awarded by the judgment of the chancellor amounted to $1,040, but was credited by $365.64, the sum appellees, Manning & Combs, owed to Fairbanks-Morse & Company on the contract. The suit was brought July 6th, 1912, to recover the balance due on a written contract which was executed May 4th, 1910—more than two years before the suit.

The contract was in the form of a written order or proposal to purchase certain gasoline engine and electrical machinery, and was signed by the appellees, Manning & Combs, and by James H. Smith, appellant's traveling salesman. The order, by its terms, was subject to acceptance and approval by appellant. It was signed and approved by the appellant; the machinery shipped and installed.

By the terms of the contract, the appellees were to pay $735 for the machinery and equipment specified. $235 of it was to be paid when the shipment was made; $250 six months after shipment; and $250 twelve months after shipment. The first payment was promptly made. The second was made shortly after maturity. This suit was brought to recover the amount of the third payment, and also the value of some electrical supplies shipped on appellees' order in the meantime. The defendants, appellees here, in effect, admit the indebtedness, and the lower court so adjudged, but, by way of counter-claim, they sue for damages which they sustained to the extent of $1,250, as a result of alleged fraudulent misrepresentations by appellant's agent in the sale, and breach of warranties as to quality and working possibilities of the machinery. These misrepresentations and

warranties, as appellees allege, were parts of an oral contract contemporaneous with the written contract relied upon by appellant. The oral contract, relied upon by appellees and set up in their amended answer and counter-claim, describes in detail, requiring one page of typewriting, all of the machinery and equipment purchased, and uses practically the same words as the written contract.

The principal things purchased were an 8-horse-power gasoline engine, a 5 kilowatt dynamo, and an 18″ Nordyke & Morman farm and plantation (grist) mill, 28 Tungston lamps (40 watts), with sockets, etc., for installing the 28 lamps, 225 feet of lamp cord, and 3,600 feet of rubber-coated wire. Appellees say that the oral contract was not reduced to writing, but they admit that they did sign the contract upon which appellant based its action, and which appellant's agent then and there wrote out, or rather inserted, with a pen and ink, the articles purchased, with some other details, in a regular printed blank form of contract. Appellee Manning says: "I did not sign this writing as indicated (as a contract), but merely as an order, exactly as I have heretofore related on my direct examination." The reference to his direct examination is his testimony that the agent Smith said that he would use that form as an order, because he had no other forms with him, and that an order would have to be sent into the house. "We did not object to this, and Mr. Smith assured us that the objectionable features of the form would make no difference in submitting the order on this form, as he would explain the matter to the house; that is, Fairbanks-Morse & Company. Then we gave him the order." It is not explained just what features of the contract, other than the form, were objectionable, unless it is the one then and there erased by drawing a pen through the three printed lines of the contract, which provided that if the purchaser countermanded the order, or refused to receive the property, he would pay, as liquidated damages, 20 per cent. of the contract price. In lieu of this was substituted a provision giving the purchaser one month's time, until June 4th, in which he might cancel the contract. There is no allegation of fraud or mistake in the written contract, unless it be as to the effect intended to be given to the instrument, nor is there any contention that anything was left out of the writing which the parties in-

tended should be incorporated in it.   In other words, the written contract is not attacked—it is insisted, rather, that they did not intend to give any written evidence of the contract.   At most, their contention amounts to a claim that there was a contemporaneous oral contract relative to the same subject matter.   Manifestly, the facts stated do not amount to a fraud in obtaining their signatures, and the effect of a written instrument must be ascertained from the language used—it does not matter whether it is called an order or a contract.

The written contract stipulated that the engine should be tested at appellant's factory before shipment, and develop 8 actual horse-power. The appellees do not claim that the engine would not develop 8 horse-power.   They say that appellant's agent represented that it would have power, with a consumption of one-half gallon of gasoline per hour, to run a dynamo, and light the town with at least 80 lights, or it would run the grist mill, with the same consumption of gasoline, and grind 20 bushels of corn per hour into merchantable meal.   The grist mill was of the French-Buhr type, and the appellees claim that the under-runner was a defective stone, and of such poor quality that its capacity was not greater than 10 bushels of meal per hour, and that the engine, whether belted to the light plant or the grist mill, consumed a gallon and a half of gasoline per hour, which cost 20 cents per gallon.   Appellant's agent says that, as to the grist mill, he showed them the manufacturer's (Nordyke & Morman) catalogue, which represented the mill's capacity on table meal at 8 to 12 bushels per hour, and on crushed corn for stock food at 15 to 30 bushels per hour, but these conditions varied according to the dryness of the corn and the demands of their community as to fineness of the meal.   He represented that the engine would consume one pint of gasoline per horse-power per hour. He said that appellee Manning first intended lighting his store, then his residence two blocks away, and then asked if he could supply current for lights to places between, and the agent answered that he could, as the dynamo would generate current for 80 lights of the size lamps named in the contract.   The testimony of appellant is to the effect that the machine would do that if the lights were arranged within the compass named, but the appellant undertook to supply lights to a great many other places in town, some of them 400 yards away.   The con-

tract shows that only 28 lamps and lamp fittings were ordered. We have already noted the only specifications as to size and power of the engine, dynamo and mill. The written contract guaranteed only that the engine would develop the horse-power named, and that all material and workmanship would be of the best kind, and all parts properly proportioned for strength and rigidity, with a large factor of safety; that repairs required at any time within one year from date the machinery was installed would be furnished without charge to the purchaser, provided they were made necessary by inherent defects of either material or workmanship. The writing further stipulated that it was executed in duplicate and understood "that there is no verbal understanding whatever between us changing or modifying its written terms." Appellee Combs admitted having possession of an unsigned copy of the written contract, but insisted that it was entirely different from the copy filed with the petition, but never told the difference. It was never produced, although he was requested by appellant so to do. As already noted, there was nothing in the contract about consumption of gasoline or grinding capacity of the mill. The outfit was installed in a house which, with the lot, cost appellees $150. At the time the suit was filed appellee Manning was under contract to sell for $500 his half of the outfit. They operated the light plant 15 months, and at the time of the suit were still operating the grist mill, although they admit having discovered the alleged defects and falsity of Smith's alleged oral representations, particularly as to the grist mill, in a month or so after the machinery was installed. They never called for repairs or asked for other machinery in its place, nor did they make any complaint of any deficiencies or misrepresentations until the answer and counter-claim were filed. As already stated, they made the initial payment. The second payment was made nearly a year afterwards. On April 5th, 1911, in response to a request for this payment, they called attention to two or three months' delay in getting the machinery installed, and begged for indulgence as follows:

"While the strict letter of this *contract* makes the payment past due, as a matter of fact and right the payment is not so badly overdue. However, we would not withhold payment unless necessity required and we trust you will be able to indulge us."

The necessity referred to was lack of money. On August 31st, 1911, they promised to make the last payment on or about October 15th. On December 15th they asked for six months' further time, with the explanation that "Our finances have tightened up on us."

The appellees are shown to be men of intelligence. If they did not read the writing which they signed, they had every opportunity to do so. In fact, they do not claim ignorance of its terms. They say that appellant's agent said that he would use it as an "order," and the objectionable features would not make any difference. If there were objectionable features, they should have been eliminated then, and the proof shows that the appellees were cautious enough to have eliminated a provision which might subject them to damages. If representations had been made to them which they intended to rely upon, they should have been incorporated in the contract, and appellees give no reason why they were not. Case Mill Manufacturing Co. v. Vickers, 147 Ky., 396; Case Threshing Machine Co. v. Mattingly, 142 Ky., 583; Blake v. Black Bear Coal Company, 145 Ky., 788; Western Manufacturing Co. v. Cotton & Lang, 126 Ky., 749; United Talking Machine Co. v. Metcalfe, 164 Ky., 258.

Appellees' counsel correctly states the principal question presented, viz:

"Was the contract between the parties in parol, as claimed by appellees, or is the writing filed by appellants the contract between the parties?"

Where the writing purports to express a part only of the contract, or it is expressed in such short and incomplete terms as to render parol evidence necessary to explain what is *per se* unintelligible, and the proposed parol evidence is not inconsistent with the terms of the writing, then parol evidence is admissible to complete or explain the contract. Castleman & Blakemore v. Pickle & Craig, 163 Ky., 750. In that case there is a full discussion of the principles, and many authorities are cited. But we think the facts of this case clearly bring it within the rule which is thus stated in Greenleaf on Evidence (15th Ed.), Section 275:

"When parties have deliberately put their engagements in writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and

manner of their undertaking, was reduced to writing; and all oral testimony of a previous coloquium between the parties, or of conversation or declarations at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected.''

The same rule is laid down in Elliott on Contracts, Section 1893, and has been uniformly followed in Kentucky. Beattyville Bank v. Roberts, 25 Ky. L. R., 1796, 78 S. W., 901; Lanham v. L. & N., 120 Ky., 151; Gas Company v. Hardesty, 112 S. W., 847; Electric Co. v. Carter, 133 Ky., 90; Salyer v. Salyer, 141 Ky., 648; Sutton v. Kentucky Lumber Co., 19 Ky. L. R., 1604; Worland v. Secrest, 106 Ky., 711; Bassett v. Bassett, 159 Ky., 117.

It follows that demurrer should have been sustained to all of the answer which related to the contemporaneous oral contract, and all the evidence about it was incompetent. The judgment of the lower court was erroneous because it was based upon this oral contract.

The judgment is reversed, with directions to dismiss the counter-claim, and render judgment against appellees for the amount claimed in the petition.