## Mayo Arcade Corporation v. Bonded Floors Company.

(Decided May 15, 1931.)

HAGER, PRICHARD & MALIN and FRANCK C. MALIN for appellants.

DYSARD & MILLER and JOHN W. McKENZIE for appellee.

OPINION OF THE COURT BY JUDGE BRATCHER.—Affirming.

This action was instituted in the Boyd circuit court by the Bonded Floors Company against the Mayo Arcade

Corporation and the Cameron Arcade Company to recover the sum of $1,487.57. This sum represented the balance due on a written contract, by the terms of which the appellee, Bonded Floors Company, who was the plaintiff below, agreed to install linoleum in the basement of the Camayo Arcade Building in Ashland, Ky. This building was jointly owned by the appellants. The written contract was dated July 10, 1926, at Ashland, Ky., and signed Mayo Arcade Corporation by Alexander Cameron, vice president, Cameron Arcade Company by Alexander Cameron, president. This contract was approved by the Bonded Floors Company on the 13th day of July, 1926, and signed by W. V. D. Newbegin. Several copies of the contract were executed at the same time, and, upon approval by the Bonded Floors Company, one was returned to each of the appellant corporations. Under the terms of the contract, the appellee, Bonded Floors Company, was to furnish and install in the basement of the appellants' Arcade building in Ashland, Ky., 6 m m gray battleship linoleum for the sum of $2,320, this being upon an estimated basis of 800 square yards of material, additions or reductions at the rate of $2.90 per square yard. The face or front side of the contract is in words and figures as follows:

"Bonded Floors Company, Inc.,
"Division of Congoleum-Nairn, Inc.

"1965—E. 66th Street
"Cleveland, Ohio

"Proposal No.                    Date July 10, 1926.
For 6mm Gray
"Operation: Camayo Arcade & Office Building.
"Location: Ashland, Kentucky.
"Plans by: Albert F. Klein

"Dated                    No. ———

"To: Mayo Arcade Corporation, Cameron Arcade Company, Ashland, Kentucky.

"For the sum of twenty-three hundred twenty dollars ($2,320.00) we agree to furnish and install complete 6 m m. Gray Battleship linoleum.
"In the above building, as follows: Basement, In passage from Winchester Avenue Building to

Carter Avenue Building. In Winchester Avenue Building space opposite passage 21′ 0″ x 47′ 0″. In Carter Avenue Building basement with space deducted for fixtures of 8′ x 30′ and space approximately 12′ x 30′. This is estimated on a basis of 800 Sq. yd. of material, additions or deductions at the rate of $2.90 per sq. yd., deductions not to exceed 25% or yardage as estimated. Sub floor guarantee by C. L. Higsbee Water-proofing Company of Toledo, Ohio for 5 years.

"Subject to Conditions on Reverse Side.

"Only such work as is specifically designated above is included in this proposal, which supersedes all previous proposals and agreements. Unless otherwise provided herein, any Treadlite, Cork or Rubber Tile included in this proposal shall be of standard size and color, 6″ x 6″ or larger.

"Acceptance—This proposal is rendered for prompt acceptance. After it has been accepted and signed by you and approved by a duly authorized official of this Company, it shall constitute exclusively a contract for the entire work embraced herein. Until such time it is subject to withdrawal or change without notice.

"Bonded Floors Company, Inc.

"By Chas. Preston.

"Acceptance

"Mayo Arcade Corporation

"Accepted by Alexander Cameron, V. P.

"Dated July 10, 1926.

"Cameron Arcade Company

"By Alexander Cameron, Pres.

"Approval

"Approved and accepted by Bonded Floors Company, Inc.

"Dated 7/13/26 By W. V. D. Newbegin."

This contract was in the form of a proposal, made by the appellee, to become the contract upon approval. The reverse side of the sheet contained a number of conditions, section 4 of which reads as follows:

"We guarantee this installation, except as per items 'A,' 'B,' 'C,' noted below, against all defects arising from improper materials and workmanship for a period of ——— years from date of installa-

tion, and upon receipt of full payment of work, we will furnish a surety bond of the United States Fidelity & Guaranty Company to secure the performance of this guarantee.

"'A.' We do not assume responsibility for defects due to defective sub-floors or defective backing, nor for trouble which arises by reason of dampness in the underfloor.

"'B.' We do not under circumstances guarantee any of our flooring materials when laid on concrete or other backing which is in direct contact with the ground, either on or below grade.

"'C.' We do not assume responsibility for defects due to improper methods of maintenance. Apply for our cleaning instructions."

The appellee, Bonded Floors Company, was represented by Chas. Preston. The appellants' corporations were represented by Alexander Cameron, president of the Cameron Arcade Company and vice president of the Mayo Arcade Corporation.

The work was begun, and completed during the month of October of 1926. Within a few weeks after the installation of the linoleum, it was observed that breaks and cracks had occurred in it. It had become loose from the floor and apparently decayed. The condition of the linoleum soon became so bad that the appellants were compelled to remove a part, if not all, of it from the floor. The stipulated amount of the contract to be paid was subject to increases and decreases in yardage not to exceed 25 per cent. It was found that the quantity of material exceeded the estimate, requiring 825½ yards, and that the cost of installation was correspondingly increased to $2,393.95. In addition to this sum, the appellee claims $93.62, representing the expense incurred by the workmen coming to install the linoleum without being able to begin work. There was a payment of $1,000 made upon the account.

The appellants filed their joint answer, which they made a counterclaim and set-off. After denying the allegations of the plaintiff's petition, they affirmatively allege that the appellee, Bonded Floors Company, agreed to furnish the linoleum and all the material necessary to properly install it, in good workmanlike manner, that the linoleum should be first class in material and workmanship, and guaranteed it for a period of five years.

The appellants further state in their answer:

"That after said agreement was entered into between them and the plaintiff the plaintiff attempted to reduce the same to writing and presented to the defendants for their signatures plaintiff's printed form of contract which is the contract sued on herein, but that the same does not contain and express the contract and agreement made between the plaintiff and defendants in that it does not contain the agreements, representations and guarantees aforesaid and does contain in Section 4, and subsections 'A' and 'B' thereof, matters which were not embraced or contained in the contract made between the plaintiff and the defendants and which are no part thereof, and that said Section 4, referred to as 'Guarantee,' and sub-sections 'A' and 'B' thereof, were and are no part of the contract made and entered into between the plaintiff and the defendants and that the same are in said contract sued on by mutual mistake of the parties or by the fraud of the plaintiff and mistake of the defendants and should not be contained therein and are no part of the contract entered into between the plaintiff and the defendants and that the contract, representations and guarantees hereinbefore alleged were omitted from said contract by mutual mistake of the parties or by the fraud of the plaintiff and mistake of the defendants and the said guarantees and representations herein alleged are the real guarantees and representations made by the plaintiff and that the same should be a part of said writing sued on."

They further allege in their answer and counter-claim that the floors were water-proofed by C. L. Higsbee Waterproofing Company, as was required in the contract; that this waterproofing was accepted and approved by the appellee, before the installation of the linoleum. They state that appellee guaranteed the linoleum and installation for five years; that the linoleum installed was worthless by reason of the defective material and workmanship, and they had been damaged in the sum of $2,500. They pray, as a final relief, that the contract be reformed and made to state the true agreement, and that they have judgment for damage in the sum of $2,500.

By an amended answer, appellants, in detail, state appellee's agent, Preston, had authority to make changes in the printed forms; that he specifically promised and agreed before the contract was submitted to the appellee for approval that subsections A and B of section 4 would be stricken from the written contract; that the representations were false and fraudulent, and made to deceive defendants and to induce them to sign said contract; that they relied upon the statement made by appellee's agent; that, but for such representation, they would not have signed the contract.

By reply, the appellee denied each and every affirmative allegation of the answer and amended answer. This action, originally begun as an ordinary action, was transferred to the equity docket and heard by the court. Upon the final submission, a judgment was entered in favor of the Bonded Floors Company in the sum of $1,487.57, the balance due on the contract.

There are but two grounds relied upon by the appellants to reverse this judgment: (1) That the contract was obtained by fraud upon the part of the appellee and mistake on the part of appellants; (2) that the linoleum was defective in material and workmanship.

The facts in this case are very different from those in the usual cases involving reformation of contracts for mistake or fraud. The ordinary case grows out of the insertion, or the omission, of something necessary to the contract, or the ignorance of its contents, by failure of the party asking reformation to read or examine it. Quite the reverse is true in this case. The whole question here revolves around section 4, subsections A, B, and C of it. There is no argument made that the appellants did not know and understand full well the existence and contents of that section in the written contract. They rest their argument upon the evidence that the agent of the appellee's company agreed to eliminate that section, and, in lieu thereof, to guarantee the installation of the linoleum for a period of five years.

A brief-examination of the evidence here conduces to a better understanding of the facts as regards the signing of the contract. The appellants had previously considered installing battleship linoleum on the floors of the basement of their buildings, but had abandoned the idea, for the reason that no concern would guarantee it.

The appellee's representative, Mr. Preston, called at the office of Mr. Cameron in Ashland, and entered into negotiations for the installation of battleship linoleum on the basement floors of the Arcade building. Upon an examination of the floors of the building, the discussion centered around section 4 of the contract. Mr. Cameron, Mr. Mayo, president and vice president of the Arcade Corporation, and Mr. Klein, the architect, testified in this case. They each testified that it was agreed by the appellants and the appellee's agent that the objectionable section of the contract would be eliminated; that the elimination of that clause was conditioned upon the appellants having the floors of the building waterproofed by the C. L. Higsbee Waterproofing Company, and that that condition was inserted in the written contract by Mr. Preston. In addition to requiring them to waterproof the floors, Mr. Preston required the subfloors to be guaranteed by the C. L. Higsbee Waterproofing Company for a period of five years. They signed the contract upon these conditions, and the promise that subsection 4 would be eliminated. This contract, it will be remembered, was signed in Ashland, but was to become binding when approved by the appellee's corporation, whose office was in Cleveland, Ohio. The objectionable clause was not eliminated from the contract. Mr. Cameron testifies as follows:

"Q. You say that Mr. Preston agreed to guarantee this job for five (5) years? A. Yes.

"Q. If you eliminate the clauses 'A' and 'B', there is no guarantee of any kind in this contract. Will you tell the Court why you did not require him to say in there that he would guarantee it for five (5) years? A. That was to be written in and the balance was to be removed.

"Q. Do you mean that the word 'five' was to be written in clause 4 before the years'? A. That was our understanding.

"Q. The clause 'A' and 'B' were to be marked out. A. Yes, they were to be eliminated.

"Q. Why did you not mark them out? A. Just for the same reason I stated a moment ago, that I considered that Mr. Preston was representing a nationally known company of good reputation and that his House would back him up in his statements to us.

"Q. Then you had examined Section 4 and clauses 'A' and 'B' of that section before you signed that contract? A. No, it was our verbal understanding.

"Q. Then you mean to say that you signed this contract without reading it? A. I mean to say that the points in question were thoroughly gone over and agreed upon and upon that assumption the contract was signed.

"Q. Then you mean to say that you signed this contract without reading it? A. Yes sir."

Mr. Cameron testifies that he did not read section 4 and the clauses therein, yet he testifies that he discussed thoroughly these questions with Mr. Preston:

"Q. Did you discuss with Mr. Preston these clauses 'A' and 'B' of Section 4 of this contract? A. We discussed them very thoroughly.

"Q. When did you do that, was it after he brought this contract back with the typewritten matter in it? A. It had been a constant point of discussion from our first acquaintance with Mr. Preston.

"Q. Can you give the Court any reason why when you signed this contract you did not take your pen and mark out Section 'A' and 'B' of section 4? A. Why, simply because dealing with houses of national reputation I would more or less allow them to assume that much of the responsibility."

We are here confronted with a peculiar statement of facts. While Mr. Cameron did not read the contract, or section 4 of it, he was familiar with it. He states that it was the subject of constant discussion. His knowledge of it is apparent and undeniable. The statement of Mr. Cameron is corroborated by that of Mr. Mayo and Mr. Klein. An examination of this record and the exhibits filed with it are clear and convincing that the appellants received but little, if any, benefits from the money they expended for the linoleum. Mr. Preston stated: That he took up the matter of selling linoleum with Mr. Klein and Mr. Cameron. That, as soon as he learned that the linoleum was to be laid on a concrete floor, he refused to guarantee it. That he had no authority to make a final contract. That could only be done by the district manager, Mr. W. V. D. Newbegin. The pro-

posal was made upon the regular forms furnished by the company. That section 4 was a part of that form. The company positively did not sell linoleum to any one to use over a concrete floor except upon the basis of the guarantee exceptions contained in this particular form. That he called Mr. Cameron's, Mr. Mayo's and Mr. Klein's attention to the fact that his company would not guarantee linoleum on a concrete floor below grade. He further states that upon that statement Mr. Klein went to the files and found the C. L. Higsbee Waterproofing Company of Toledo, Ohio, had guaranteed the floors, and that the clause, "sub-floors guaranteed by C. L. Higsbee Waterproofing Company of Toledo, Ohio, for five (5) years," was then inserted in the contract. He denied he told any one, directly or indirectly, or made any statement that would lead them to believe, that his company was waiving the protection of section 4. The signed contracts remained in the possession of the appellants from on or about the 13th day of July, 1926, until on or about the 15th day of November, 1926, before these objectionable features were observed or appellee's attention called to them.

This court is asked to reverse this judgment and reform the contract by eliminating subsection 4, inserting therein the five-year guarantee, upon the ground of fraud practiced by the appellee's agent, Mr. Preston. It is a well-settled principle of law that courts of equity have authority to reform contracts consistent with the intentions and understanding of the party for fraud or mutual mistake. The rule is that the evidence to sustain such interference must be clear and convincing, and the fraud and mistake must be established with reasonable certainty. Salyer v. Salyer, 141 Ky. 648, 133 S. W. 556; Northern Coal & Coke Company v. Bates, 146 Ky. 624, 143 S. W. 13; F. Haag & Brother v. Damon Manufacturing Company, 153 Ky. 840, 156 S. W. 884; Bowling v. Bowling, 172 Ky. 32, 188 S. W. 1070; Cornett v. Kentucky River Coal Company, 175 Ky. 718, 195 S. W. 149; Roberts v. Parsons, 195 Ky. 274, 242 S. W. 594; Kentucky & West Virginia Power Company v. Leslie, 208 Ky. 246, 270 S. W. 757; Kentucky & West Virginia Power Company v. Gilliam, 210 Ky. 820, 276 S. W. 983; Collins v. Isaacs, 231 Ky. 377, 21 S. W. (2d) 474; United Talking Machine Co. v. Metcalfe, 174 Ky. 132, 191 S. W. 881.

While, as it has been said in the case of French v. Boyle, 230 Ky. 619, 20 S. W. (2d) 439, 440, "no invariable rule can be laid down as to the quantum of testimony necessary to sustain the burden imposed upon the party who seeks to have a duly executed contract reformed upon the ground of fraud or mistake, since each case must be determined upon its own peculiar facts and circumstances, . . . the general rule is that the evidence must be 'clear, unequivocal and convincing.' "

To the same effect is the rule in Griffith v. York, 152 Ky. 14, 153 S. W. 31. This rule seems to have been followed universally by the courts in this jurisdiction and that the relief sought herein has been afforded only when the mistake and fraud appeared beyond reasonable controversy. The fraud and mistake is not established beyond a reasonable controversy. There is a sharp conflict in the evidence. In the case of Litteral v. Bevins, 186 Ky. 514, 217 S. W. 369, 370, the court said: "Where the evidence is conflicting, the relief will not be granted, even though a preponderance of the evidence supports the allegation of mistake."

In the same case, in discussing the controversy in that case, the court said:

"To reform an instrument to accord with the intent of one of the parties, when the other is insisting it correctly expresses the agreement as understood by him, the writing thus altered would be just as far from expressing the agreement of the parties as before."

Courts of equity will generally give no relief to a complaining party where means of knowledge of the truth or falsity of the representations are at his hands. He will be presumed to have had knowledge. 13 Corpus Juris, 393; Marshall v. Peck, 1 Dana, 609; Moore v. Turbeville, 2 Bibb, 602, 5 Am. Dec. 642; First National Bank of Stanford v. Mattingly, 92 Ky. 650, 18 S. W. 940, 14 Ky. Law Rep. 68. The appellants knew that section 4 and subsections A, B, and C were retained in the executed contract. They knew, or could have known, by the exercise of ordinary diligence, that the contract was forwarded to appellee's district manager for approval, with

section 4 and subsections A, B, and C unaltered. Kreate v. Miller, 226 Ky. 444, 11 S. W. (2d) 99.

We are led to the proposition that the reformation of a contract, as a relief, will not be afforded where the complaining party is negligent. The law will not interfere to protect one from the result of his own negligence. Daniel Boone Coal Company v. Crawford, 203 Ky. 666, 262 S. W. 1097, and a list of authorities cited in that opinion. The rule seems to be the same in other jurisdictions. See Gunter v. Edmonds, 149 Ga. 518, 101 S. E. 118; Green v. Johnson, 153 Ga. 738, 113 S. E. 402; Comerford v. U. S. Fidelity & Guaranty Company, 59 Mont. 243, 196 P. 984. The text in 23 R. C. L. 349, states the rule as follows:

"Equity will not extend its aid to one who has been guilty of culpable negligence. The term 'mistake' carries with it the idea of fault in him to whom the mistake is imputed; but, of course, the mere fact that a mistake was made in an instrument does not show such negligence as to bar the right of reformation for if that were so, a Court of Equity never could interfere. But equity does require that the party who asks relief on the ground of mutual mistake shall have exercised at least the degree of diligence which may be fairly expected from a reasonable person.

See, also, Grieve v. Grieve, 15 Wyo. 358, 89 P. 569, 9 L. R. A. (N. S.) 1211, 11 Ann. Cas. 1162.

We are referred in the brief for the appellee to the case of Reid, Murdock & Co. v. Bradley, 105 Iowa, 220, 74 N. W. 896; McCormack v. Molburg, 43 Iowa, 561; James v. Dalbey, 107 Iowa, 463, 78 N. W. 51, 52. In the McCormack Case the court uses these words:

"If the means of knowledge of the alleged fraud were equally open to both parties the law will not interfere to protect the negligent. . . . 'If the truth or falsehood of the representation might have been tested by ordinary vigilance and attention, it is the party's own folly if he neglected to do so, and he is remediless.' "

To these might have been added the case of Shores-Mueller Company v. Lonning, 159 Iowa, 95, 140 N. W. 197, 199. In that case the court said:

"As a rule, if a party is able to read and has a chance to do so, but omits this precaution because of his adversaries' statements, as to the contents of the instrument, his negligence will estop him from claiming that the instrument is not binding."

The appellants rely upon the case of Western Manufacturing Company v. Cotton & Long, 126 Ky. 749, 104 S. W. 758, 31 Ky. Law Rep. 1130, 12 L. R. A. (N. S.) 427. We do not find the general rule in that case different from rule in the cases above cited. In that case a drummer representing the appellant entered into negotiation with the appellee, Cotton, for the sale of certain merchandise. After the terms had been agreed upon, the appellant's agent produced a written form, read it to the appellee, Cotton, or rather pretended to read the terms of the agreement. It developed that the agent had not inserted the agreement in the contract, but had written in terms very different from the agreement, and then misread the contract to appellant. The court held in that case that the agent's fraud bound the principal, and that they were barred recovery on the contract. As was said in French v. Boyle, supra, each case must stand upon its own peculiar facts and circumstances, and the facts are very different in the case of Cotton & Long to the one under consideration. In the case at bar, the appellants make no claim that they did not know, at all times, that the contract, as signed, was submitted to the appellee for approval, approved, and a copy returned to them with the objectionable features unaltered. The case at bar is very similar to that of Fairbanks-Morse & Co. v. Manning & Combs, 164 Ky. 478, 175 S. W. 1000, 1001. In that case the appellees, Manning and Combs, contended that the agent of Fairbanks, Morse & Co. made representations to them orally other than that expressed in the written contract, and that they signed the written contract merely as an order with the assurance of the agent that the objectionable feature of the form would make no difference, as he would explain it to the house; that upon that promise they gave him the order. The court in that case said:

"The appellees are shown to be men of intelligence. If they did not read the writing which they

signed, they had every opportunity to do so. In fact they do not claim ignorance of its terms. They say that appellant's agent said that he would use it as an 'order,' and the objectionable features would not make any difference. If there were objectionable features, they should have been eliminated then. . . . If representations had been made to them which they intended to rely upon, they should have been incorporated in the contract, and appellees give no reason why they were not."

The second ground relied upon by the appellants is that the linoleum furnished was of inferior grade, and that it was installed defectively. There is no dispute as to the condition of the linoleum a few weeks after it was installed. There is filed in this record a number of photographs showing the condition of the linoleum in various parts of the building. The defective condition is easily seen in these photographs. The evidence is clear and convincing that within a few weeks after the linoleum was layed it became loose at the joints, buckled, that the surface of the linoleum came loose from the burlap backing, and holes came in it. To make a long story short, the linoleum was of no practical service to defendants, and almost a total loss, if not wholly so. There, however, is no positive evidence of the inherent defect in either the material or workmanship. The witnesses testified as to the condition a few weeks after its installation. The appellant, in answer to that, reasoned that the unsatisfactory condition of the linoleum was not due to any defect in material or workmanship, but resulted from the condition of the basement; excusing themselves from liabilities from that condition by the terms of the contract and that ever-present section 4.

We conclude, in view of the authorities above cited, that the appellants were negligent in signing this contract, and that in view of that negligence in failing to protect themselves by the exercise of diligence and caution as would be reasonably expected of men of their ability, training, and experience, and that they are, therefore, under the showing of this record, bound by the terms of the written contract.

Wherefore judgment is affirmed.