RENDERED:  NOVEMBER 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1110-MR

DONALD LYNCH                                                    APPELLANT

v.        APPEAL FROM PULASKI CIRCUIT COURT
          HONORABLE TERESA WHITAKER, JUDGE
          ACTION NO. 99-CR-00152

COMMONWEALTH OF KENTUCKY                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, EASTON, AND McNEILL JUDGES.

McNEILL, JUDGE:  Donald Lynch appeals from an opinion and order of the

Pulaski Circuit Court denying his motion for a new trial pursuant to CR[1] 60.02(f).

---

[1] Kentucky Rule of Civil Procedure.

He argues that there was a *Brady*[2] violation because he did not receive exculpatory evidence prior to trial. Upon review, we affirm.

## BACKGROUND

On December 17, 2000, a Pulaski Circuit Grand Jury indicted Donald Lynch for murdering Steven Richmond and tampering with evidence related to the crime. Donald was subsequently tried in July the following year, and part of the evidence against him included testimony from his then-wife, Teresa Lynch, who indicated Donald had confessed to her that he had killed Richmond. Donald was later convicted of both counts, sentenced to life imprisonment (for murder) plus five years (for tampering with evidence), and our Supreme Court ultimately affirmed his conviction.[3]

Since then, the common theme of Donald's post-conviction motions has been, and remains, that his counsel should have done better at impeaching Teresa's testimony regarding his purported confession. Specifically, in his unsuccessful RCr[4] 11.42 motion and subsequent habeas petition, Donald argued an impermissible conflict of interest had discouraged his trial counsel from effectively cross-examining Teresa about it, and that his murder conviction should accordingly

---

[2] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[3] *See Lynch v. Commonwealth*, 74 S.W.3d 711 (Ky. 2002).

[4] Kentucky Rule of Criminal Procedure.

be set aside.[5]  Continuing the theme over twenty years later,[6] he then filed what would become the subject of the instant appeal:  A motion pursuant to CR 60.02 and *Brady*, in which he argued his murder conviction should be vacated because the *Commonwealth's wrongdoing* had prevented his trial counsel from effectively cross-examining Teresa about it.

As to how the Commonwealth stifled his defense, Donald focused upon a recorded telephone interview Teresa had given to Detective Doug Nelson of the Somerset Police Department on November 11, 1999.  From all appearances of record, this interview was the first occasion Teresa indicated Donald had confessed to killing Richmond.  The substance of the interview was never utilized as evidence at Donald's trial.  In his CR 60.02 motion, Donald claimed that during discovery the Commonwealth had supplied his defense with an "adulterated" recording and an incorrect transcript of that interview.  Further, he claimed that if he had been provided a proper recording and transcript, his attorney would certainly have utilized those items to impeach Teresa, and the jury would more likely than not have acquitted him.

---

[5] *See Lynch v. Commonwealth*, No. 2002-CA-002218-MR, 2004 WL 1227259 (Ky. App. Jun. 4, 2004; *Lynch v. Webb*, No. CIV. 05-111KKC, 2005 WL 1712447 (E.D. Ky. Jul. 1, 2005).

[6] In its appellee brief, the Commonwealth argues we are precluded from considering Donald's CR 60.02(f) motion because he did not file it within a "reasonable time."  We will not address this point because the Commonwealth did not raise it below, and the circuit court did not address it, either.

The Pulaski Circuit Court denied Donald's motion. The circuit court's reasons for doing so, as well as additional facts relevant to our disposition of this matter, will be discussed below in our analysis. This appeal followed.

## STANDARD OF REVIEW

> [CR 60.02] is for relief that is not available by direct appeal and not available under RCr 11.42. The movant must demonstrate why he is entitled to this special, extraordinary relief. Before the movant is entitled to an evidentiary hearing, he must affirmatively allege facts which, if true, justify vacating the judgment and further allege special circumstances that justify CR 60.02 relief.

*Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983). The standard of review on a trial court's denial of a CR 60.02 motion is whether the trial court abused its discretion. *Brown v. Commonwealth*, 932 S.W.2d 359, 362 (Ky. 1996). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted). CR 60.02 is an extraordinary remedy that is "available only when a substantial miscarriage of justice will result from the effect of the final judgment." *Wilson v. Commonwealth*, 403 S.W.2d 710, 712 (Ky. 1966).

As discussed, Donald asserts a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), entitled him to relief pursuant to CR 60.02(f). In *Brady*, the United States Supreme Court held that "suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. In *Bowling v. Commonwealth*, our Supreme Court elaborated as follows:

> As a general rule "[t]here is no general constitutional right to discovery in a criminal case and *Brady* did not create one . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 846, 51 L. Ed. 2d 30, 42 (1977). Rather, *Brady* concerns those cases in which the government possesses information that the defense does not and the government's failure to disclose the information deprives the defendant of a fair trial. Therefore, reversal is required only where "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is the probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985). Moreover, *Brady* only applies to "the discovery, *after trial*, of information which had been known to the prosecution but *unknown to the defense*." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342, 349 (1976) (emphasis added).

80 S.W.3d 405, 410 (Ky. 2002).

## ANALYSIS

Donald claims he is entitled to have his murder conviction set aside due to what he believes was the Commonwealth's suppression of material impeachment evidence. In sum, he believes the audio recording of Teresa's November 11, 1999 interview, which the Commonwealth provided to his counsel

-5-

in 2000 during pretrial discovery, was improperly altered by the Commonwealth. He believes this alleged improper alteration – along with the fact that the Commonwealth provided his defense a written transcript of that interview that also differed from the true substance of the recording – constitute "new evidence" that the Commonwealth either falsified evidence or committed extrinsic fraud upon his trial proceedings. Further, he argues there is a reasonable probability that the "new evidence" he has uncovered regarding what Teresa actually stated during her November 11, 1999 interview would have materially altered the outcome of his trial, and that its suppression therefore caused him undue prejudice. We will address each aspect of his argument below.

**1. The record does not demonstrate the audio recording of Teresa's November 11, 1999 interview, provided to Donald's counsel by the Commonwealth in pretrial discovery, was improperly altered by the Commonwealth**.

Donald's claim that his defense counsel, prior to his trial in 2000, received an inaudible or improperly altered recording of Teresa's November 11, 1999 interview is founded upon inferences he draws from the following sources: (a) a July 7, 2000 affidavit from his defense counsel; (b) a July 10, 2000 circuit court order that denied his request for a continuance; and (c) discrepancies between a recording of the November 11, 1999 interview that he obtained from the

Somerset Police Department on October 21, 2022,[7] and the written transcript of the November 11, 1999 interview that his counsel received from the Commonwealth during pretrial discovery in 2000. In its order denying his CR 60.02 motion, the circuit court held, for reasons consistent with what is set forth below, that none of those items qualified as evidence capable of supporting his claim.

We begin with his counsel's affidavit. As discussed, Donald was indicted in December of 1999. Discovery commenced the following January, and as part of that discovery the Commonwealth provided Donald's counsel with several dozen recorded statements it had taken from Donald and roughly fifteen other individuals whom the Commonwealth had interviewed as potential witnesses – including Teresa. Donald agreed to be tried in late July of 2000, but on July 7, 2000, he moved for a continuance. Attached to his motion was the affidavit from his counsel, which provided in relevant part:

> 4. The discovery is voluminous and consists in part of approximately fifty audio tapes, both of the micro cassette variety and of the standard variety. Some of those tapes were provided within the [discovery] deadline; however, the undersigned agreed with the Commonwealth that more time would be necessary in order [to] make the copies of the tapes, in order [to] comply with the prior orders of the Court. . . .
>
> . . .

---

[7] Donald received the recording of Teresa's November 11, 1999 interview from the Somerset Police Department on October 21, 2022, pursuant to a Freedom of Information Act (FOIA) request.

6. The Affiants have made diligent efforts to have the audio tapes transcribed, by a competent transcriptionist. Because of the poor quality of the audio tapes which have been furnished, the work has been slow and tedious. Many of the tapes are of such quality as to be incapable of transcription, in whole or in part.

7. The undersigned have even attempted computer enhancement of the tapes in order to make the quality of the tapes better, but have been unsuccessful.

. . .

9. On June 29, 2000, the Affiants learned that the Commonwealth has had transcripts made from certain of its audio tapes. At the direction of the Court, copies were provided to the Affiants on June 30, 2000.

. . .

11. On June 30, 2000, the Defendant, Donald Lynch, requested that the undersigned petition the Court for continuance on the grounds that the Defendant cannot adquently [sic] assist counsel in preparation for his trial because transcripts are not available on all of the tapes.

12. That this action is not made to unduly delay or hinder the ultimate trial of this action, but is necessitated by the fact that *most* of the audio tapes furnished to counsel for the Defendant are inaudible in whole *or in part*, said certain of these tapes were furnished at a much later date, and that counsel for the Defendant will not be able to adequately prepare for trial by July 24, 2000.

(Emphasis added.)

Again, Donald cites this affidavit in service of his theory that the

Commonwealth provided his defense counsel an inaudible recording of Teresa's

-8-

November 11, 1999 interview. But, it is evidence of no such thing. We have emphasized the words "most" and "or in part," as set forth in Paragraph 12, to highlight that this affidavit is couched in generalities and does not specify that Teresa's November 11, 1999 recorded interview was wholly or even partially inaudible. Any inference to the contrary is mere speculation on Donald's part.

We now proceed to the circuit court's July 10, 2000 order denying Donald's requested continuance, which Donald cites as the second evidentiary pillar of his argument. In full, the order provided:

> The Court overrules the motion to continue the trial. The Defendant's counsel obtained copies of the audio taped recorded information in February and June, and although the poor quality of the tapes made them extremely difficult to comprehend, the Commonwealth has seasonably provided transcripts made from the original recordings.
>
> The Defendant's complaint that audio tapes of witness statements were similarly difficult to comprehend is of no consequence since the Commonwealth is not required to provide such statements under the Rules of Criminal Procedure. The Commonwealth shall provide to defense counsel not later than Friday, July 14, 2000, written transcripts of any statement relating to the subject of the trial of any witness who will testify at trial. If, by the contents of such statements, it appears that the Defendant would be prejudiced in his defense by not having them sooner, the Court will reconsider the Defendant's request for postponement.

Donald believes the circuit court must have been referencing the tape of Teresa's November 11, 1999 interview that the Commonwealth supplied his

counsel during pretrial discovery when the circuit court indicated in its order that

"the poor quality of the tapes made them extremely difficult to comprehend."

However, the order makes no mention of Teresa's November 11, 1999 interview.

Furthermore, when the circuit court heard Donald's continuance motion on the

morning of July 10, 2000, it repeatedly indicated from the bench that before it

would enter its order on that matter – which it ultimately did later that afternoon –

it would verify the averments set forth in his counsel's July 7, 2000 affidavit

relative to the quality of the recordings by *only* reviewing the Commonwealth's

recorded interviews of *Donald* and *no one else*.[8]  In short, it is mere speculation to

---

[8] The relevant exchanges between counsel and the circuit court during the July 10, 2000 continuance hearing were as follows:

> COURT:  Well let me, um.  What I'm gonna do is, um, take the information you've given me and sample some of those tapes so I get a better understanding of what you've had to work with.  Can you bring me the, those tapes of Lynch?

> DEFENSE:  Yes, sir.  And I, and I want to make sure, are we getting into, at this point, and look I don't wanna seem disrespectful.  Are we getting, going to have an evidentiary hearing on whether we should have been able to have used the tapes better, or is that, or –

> COURT:  No.  I just kind of want to know what you've labored under.

> DEFENSE:  Okay.

> COURT:  Um.  To get a better idea of how this, you know, what, what kind of burden you've had to deal with.  Um.

> DEFENSE:  Well, what we could, what I could propose, we have a bin of tapes. And, you know, I could bring the, everything I've got and let you, let you just put your hand in and pull one out.  Um, rather than going through and say, "this one is bad, this one is good."  Uh, but I mean that's pretty much, you'll be able to hear the quality, I'll give you –

infer the circuit court's July 10, 2000 order assessed the quality of the recording of

Teresa's November 11, 1999 interview that the Commonwealth supplied Donald's

counsel.

Lastly, we turn to the discrepancies between the recording of the

November 11, 1999 interview that Donald received from the Somerset Police

Department on October 21, 2022, and the written transcript of the November 11,

1999 interview his counsel received from the Commonwealth during pretrial

discovery in 2000. Donald argues that because there are discrepancies between

---

COURT: Just give me the Lynch statements. The ones with Donald Lynch. Course, some of them, I know you said you put them through a computer program, they may not be, they got maybe worse. But, um.

DEFENSE: I didn't even, I didn't even make tapes of the, uh, .wav files we were able to make because it just, it then became just totally washed out.

9:42:55-9:44:43

COURT: Well, whether or not it gets continued will, will have a factor into whether, how we deal with hearings on those issues. If it is continued, we'll have, um, witnesses recognized on the trial date in any event. And um. If you'll bring me some of those, just the Donald Lynch tapes. Don't, I don't want anything else. And also the grand jury tapes, I'm just curious, I don't ever get to –

PROSECUTION: Grand jury tape's good.

COURT: Okay. I'm just kinda curious how they sound, something to compare it to.

PROSECUTION: We have already given your honor a copy, or a, we passed them around the other day, of the grand jury minutes. I think that we –

COURT: Yeah, I don't think I ever got that. Anyway, bring those in sometime this morning and I'll rule, I'll give you a ruling this afternoon.

9:56:00 -:57.

-11-

those two items, those discrepancies prove that the recording of the November 11, 1999 interview his counsel received from the Commonwealth during pretrial discovery in 2000 was inaudible or improperly altered.

In other words, Donald is attempting to indirectly prove the content of a recording that is not of record, namely, the recording his counsel received from the Commonwealth in 2000. Indeed, he could only demonstrate the recording of Teresa's November 11, 1999 interview that he received from the Somerset Police Department in 2022 qualifies as *new evidence* by contrasting it with the recording of that interview the Commonwealth originally provided him in 2000. But, therein lies the problem: KRE[9] 1002 requires a party seeking "[t]o prove the content of a writing, recording, or photograph" to submit "the original writing, recording, or photograph[.]" If Donald had demonstrated the original recording supplied to his counsel was *unavailable*, then other evidence of the recording might be admissible. KRE 1004. However, his CR 60.02 motion included no such showing or assertion. The only indication he has ever provided regarding the availability of that original recording from 2000 is found in the appendix of his CR 60.02 motion, which includes a December 5, 2002 letter from his counsel informing Donald "The tapes are *available* in my office to be picked up at any time by any person that you

---

[9] Kentucky Rule of Evidence.

request. They have been there for some period of time."[10] (Emphasis added.) In sum, Donald cites nothing capable of supporting his claim that the recording of Teresa's November 11, 1999 interview, provided to his counsel by the Commonwealth during pretrial discovery in 2000, differed from the recording he secured from the Somerset Police Department in 2022. The circuit court properly rejected Donald's contention that he secured any "new evidence" for CR 60.02 or *Brady* purposes.

**2. The "incorrect transcript" that the Commonwealth provided Donald's trial counsel cannot serve as a basis for a *Brady* violation or CR 60.02 relief predicated upon falsified evidence or extrinsic fraud**.

Stripped of any "new evidence" footing, what remains of Donald's claim relative to the transcript of Teresa's November 11, 1999 interview essentially boils down to a speculative argument of falsified evidence or extrinsic fraud. Donald summarizes his argument to that effect on page "i" of his brief as follows:

> This appeal concerns the Commonwealth's suppression of material impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. This occurred when the Commonwealth inserted false content,

---

[10] In Paragraph 24 of his CR 60.02 motion, Donald represented that on or about December 5, 2002, the warden of the Luther Luckett Correctional Complex (where Donald was housed until June 22, 2022) informed him that "under no circumstance would [Donald] be allowed to receive the audio recordings because they were evidence from the case" and that the warden "was tired of hearing from 'Frankfort' on the subject." However, nothing indicates Donald was unable – in the quarter-century since the date of his incarceration – to utilize "any available judicial process or procedure" to secure the tapes from his counsel per KRE 1004; or that those tapes cannot still be "picked up at any time by any person [he] request[s]" from his former counsel's office.

unjustified omissions, and alterations into the transcript evidence that they provided to the defense involving Teresa's police interview statements. This was done in a manner that interfered with Defense Counsel's strategic decisions and ability to defend Donald against the charge of intentional murder.

Stated differently, Donald contends that even if the 2000 and 2022 audio recordings were in fact the same, his counsel, in preparing Donald's defense, was nevertheless entitled to rely – and perhaps did so rely – entirely upon the Commonwealth's transcript of that interview without undertaking the minimal investigative step of reviewing the transcript in conjunction with the audio recording. The circuit court rejected this argument in its dispositive order, explaining:

> [Donald] does not support this allegation with facts, nor does the record provide any evidence for this assertion. Even if the transcripts provided to the Defendant were not accurate to what was said in the audio recordings, [Donald] still had access to the audio recordings of Teresa Lynch's interviews before trial. As [Donald] and the Commonwealth possessed the same information, [Donald's] due process rights were not violated.

We agree with the circuit court's analysis. Donald cites no evidence demonstrating his trial counsel's mental processes were in line with his argument. But if that had indeed occurred, it would nevertheless doom Donald's *Brady* claim. Donald and his counsel had an obligation to review the transcript and the audiotaped recording of Teresa's statements to ensure that the Commonwealth's

-14-

transcript accurately reproduced her statements. If they failed to do so, they could not later claim a *Brady* violation because *Brady* "only applies to those cases in which the government possesses information that the defense does not." *Nunley v. Commonwealth*, 393 S.W.3d 9, 13 (Ky. 2013) (citation omitted). It does not apply "if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or *if the information was available to him from another source*." *Hughbanks v. Hudson*, 2 F.4th 527, 537 (6th Cir. 2021) (citation omitted) (emphasis added). Information discoverable with such "minimal investigation" cannot give rise to a *Brady* claim. *Jalowiec v. Bradshaw*, 657 F.3d 293, 311 (6th Cir. 2011) (quoting *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001)); *see also Flonnory v. Delaware*, 893 A.2d 507, 532 (Del. 2006) (finding no *Brady* violation where the prosecution gave the defense an inaccurate transcript of a witness's recorded statement because the defense also had access to the recorded statement itself).

Likewise, it would doom any additional claim of falsified evidence or extrinsic fraud Donald asserted in this vein under the pretense of CR 60.02(f)[11] because, consistently with the forgoing, "[t]he purpose of CR 60.02 is to bring

---

[11] With few exceptions, relief from judgment for "any other reason justifying relief" per that subsection is not available unless the asserted grounds for relief are not encompassed within any of the first five clauses of rule governing relief from judgment. *McMurry v. McMurry*, 957 S.W.2d 731, 733 (Ky. App. 1997). Extrinsic fraud is encompassed in CR 60.02(d). *Id.* Falsified evidence is encompassed in 60.02(c).

before a court errors which . . . were unknown and could not have been known to the moving party by the exercise of reasonable diligence and in time to have been otherwise presented to the court." *Young v. Edward Tech. Group, Inc.*, 918 S.W.2d 229, 231 (Ky. App. 1995); *see also Mayo Arcade Corp. v. Bonded Floors, Co.*, 240 Ky. 212, 41 S.W.2d 1104, 1108 (1931) (explaining courts will give "no relief to a complaining party where means of knowledge of the truth or falsity of the representations are at his hands.  He will be presumed to have had knowledge").

**3.  There is no reasonable probability that the "new evidence" Lynch has uncovered regarding what Teresa said during her interview would have materially altered the outcome of his trial, or that Lynch was otherwise prejudiced**.

Considering what has been set forth above, the remainder of Donald's appeal is merely academic:  Because Donald has failed to demonstrate any "new evidence" exists in his case, he cannot demonstrate that any "new evidence" gives rise to a reasonable probability that the outcome of this trial would have been different, or that he was otherwise prejudiced.  Nevertheless, like the circuit court, we will address what Donald presents in this regard.  A determination of whether evidence is "material" for *Brady* purposes is made by considering the evidence

"collectively."[12]  As such, we begin by turning to our Supreme Court's summary of

the evidence adduced at Donald's July 2000 trial:

> Pertinent facts to this case began more than 20 years ago, when Appellant began dating his now-estranged wife, Teresa Lynch.  Teresa had also known the victim, Steven Dale Richmond, since the sixth grade.  Over the next 14 years, she predominantly dated Appellant, but left him in 1994 to date Richmond.  Teresa ultimately reunited with Appellant, married him in 1995, and had a son by him in 1996.
>
> According to Teresa's testimony, about a month before she and Appellant married, he began asking her about the extent of her prior relationship with Richmond.  The subject arose again, some five years later, when Appellant confronted Teresa at work, accused her of having had sex with Richmond during their past relationship, and demanded a divorce.  In response, Teresa moved out of the marital home, and, oddly enough, Richmond moved in with Appellant shortly thereafter.  By August 1999, Teresa had filed a petition of dissolution, listing the date Appellant showed up at her job as the date of the couple's physical separation.
>
> About 11:00 p.m. on September 29, 1999, Richmond and his girlfriend returned to the house he was sharing with Appellant.  The three watched television until around midnight when Richmond and his girlfriend went to his bedroom.  According to the girlfriend's testimony, when she left at approximately 1:30 a.m., Richmond asked her to return the next day and also asked her to call him and let him know that she had arrived home safely.  She called that night but did not receive an answer.  Since there was no answer the next day at noon when she returned to the house, she left Richmond a note.  She returned later, found no one at home, but

---

[12] *See Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

observed that both of Appellant's cars were in the driveway and that the note was gone.

Appellant initially told police he had no idea of Richmond's whereabouts, but suggested several places where he might have gone. Appellant claimed that Richmond left immediately after his girlfriend on the night in question, and that no one could have entered the house and harmed Richmond anyway, since Appellant slept by the front door on a couch in the living room. Even after Richmond's body was found, Appellant denied any knowledge of his death. Within an hour of discovering Richmond's body, police obtained a warrant to search Appellant's home and discovered that the mattress in Richmond's bedroom was missing.

The day after Richmond's funeral, Teresa met with Appellant to obtain documents pertaining to their pending divorce. Teresa testified that at that time she asked Appellant if he had killed Richmond and he admitted unequivocally that he had. Teresa stated that Appellant told her that he shot Richmond through the eye so that he could never look at Teresa again. Appellant's description of the shooting matched Richmond's wounds.

During a subsequent police interview, Appellant changed his story and claimed that he found Richmond's body in bed with Appellant's rifle lying next to it. Appellant claimed he had loaned Richmond the rifle, which was consistent with the caliber of weapon used in the murder. Explaining that he feared the repercussions of finding a dead man in his home, Appellant admitted taking the body to a recreational area in Scott County, Tennessee and leaving it on a bridge. He told police that he had tried to clean the mattress, but eventually disposed of it because he could not remove the blood stains. He also cleaned the rifle and placed it in his closet.

On the day of his second interview, police issued a warrant for Appellant's arrest. Upon learning of this fact,

Appellant shaved and dyed his hair, and fled to California.

*Lynch v. Commonwealth*, 74 S.W.3d 711, 711-12 (Ky. 2002).

On or about November 11, 1999, Donald returned to Kentucky and, following a standoff with law enforcement after barricading himself inside a home, he was arrested that day. Teresa gave her November 11, 1999 interview to Det. Nelson during that standoff. As indicated, Donald believes what was said during that interview could have been used to later impeach Teresa's testimony at his trial. To review, Teresa testified that on the day after Richmond's funeral (*i.e.*, October 7, 1999), while meeting with Donald in the driveway of her sister's home to exchange documents relevant to their ongoing divorce proceedings, she asked Donald about Richmond's death. Specifically, she testified:

> TERESA: We were just saying our good-byes and I asked him if he killed [Richmond] – or asked him if he did it.
>
> Q: And what did he say?
>
> TERESA: He said, "Fuck yeah, I killed him."
>
> Q: Did he say anything else about the killing?
>
> TERESA: In detail?
>
> Q: What did he say?
>
> TERESA: He said he shot him in the left eye.
>
> Q: Did he say why he had shot him in the eye?

TERESA:  He said something to the effect of that you'll never see my wife's body again.

Q:  Did he say naked body or body again?

. . .

TERESA:  He said, "I shot him, and I told him you'll never lay another eye on my wife's naked body again."

Trial Record (TR) at 418-19.

During cross-examination, Donald's counsel focused on the premise that Donald may not have been serious when making the comments related by Teresa, and that he may have instead simply intended – considering the acrimony of their ongoing divorce proceedings – to hurt Teresa's feelings.  Teresa responded by indicating she did not believe Donald had been joking.  TR at 433.  This leads to why Donald believes Teresa's November 11, 1999 transcript was "material" for *Brady* purposes.  He asserts a more accurate transcript would have encouraged his trial counsel to pursue other avenues of impeaching Teresa regarding her testimony set forth above.

In that vein, Donald compares select portions of the transcript of Teresa's November 11, 1999 interview that the Commonwealth provided his counsel in 2000, with the audio recording he secured from the Somerset Police Department in 2022.  He argues if his trial counsel had relied upon the substance of the audio recording set forth below, rather than the Commonwealth's transcript set

forth below, it would have encouraged his trial counsel to question Teresa regarding: (1) whether Donald was the true source of the purported murder confession, or whether Donald's purported murder confession was merely something Teresa adopted from Det. Nelson; (2) why Teresa did not inform Det. Nelson about Donald's confession until November 11, 1999, rather than during her prior interviews with Det. Nelson on October 8 and 10, 1999; and (3) whether she believed that doubts regarding the paternity of the child she shared with Donald, rather than sexual jealousy, might possibly have motivated Donald to kill Richmond. In support, Donald contrasts the following:

| Commonwealth's transcript of Teresa's November 11, 1999 interview: | Audio Recording of Teresa's November 11, 1999 interview obtained pursuant to Donald's FOIA request (as memorialized by this Court following review): |
|---|---|
| NELSON: Teresa, when you talked to [Donald], what did he specifically tell you he had done to Steve? | NELSON: Teresa, when you talked to [Donald], what did he specifically tell you he done to Steve? |
| TERESA: Uh, he told me that he ------ | TERESA: Uh. Uh, that he shot him in the left eye. |
| NELSON: In the left ---- Did he say why? | NELSON: In the left, did he say why? |
| TERESA: He said that Steve started talking about me and – me and him when we used to go out. | TERESA: Uh, he said Steve started talking about me and, me and him when we went out, during it. |
| NELSON: Right. | NELSON: Right. |
| | TERESA: Uh, taunting, taunting him. |

-21-

TERESA: Uh – taunting him. Taunting him.

NELSON: Okay. And that is ---- did you tell me earlier about something he said, he would never look at your naked body again or something like that ---

TERESA: He ------ something to that. He added that -------- remember word for word but it was something, you know, but then again, ---- I may have ------- shot for even telling that.

NELSON: Well, I can understand that.

TERESA: But if Steve told him ---- I don't want him to kill himself. I don't want him to do that.

NELSON: Teresa I will tell you. The state has called in a special response team and that is what they handle, so that is probably the best people in the whole state to handle this.

TERESA: But he told me – you know, nobody had ever -------- he told me that day. You know. We need to know what happened.

NELSON: Oh absolutely. I want to know.

TERESA: You know ------- premeditated murder and then he said, he said that day, you know, we don't know what happened. That is why I want to talk to him. You know -----

NELSON: Okay.

TERESA: Taunting him.

NELSON: And that's, that's. Did you tell me earlier about something he said, he would never look at your naked body again or something like that?

TERESA: It was something to that, yes. But, those were not the exact, remember I told you I can't remember word for word. But, it was something.

NELSON: Right.

TERESA: You know, but then again, you know, I may have screwed it up. I was in shock that he was sitting there telling me that, you know.

NELSON: Well, I can understand that.

TERESA: I mean, I need to [unintelligible] then. God's honest truth, I have got to get him out of that house. I don't want him to kill himself. I don't want him to do that.

NELSON: Well Teresa, I'm telling you, the state's called in their special response team, and that's what they handle, so that is probably the best people in the whole state to handle this.

TERESA: But like you told me, you know, nobody had ever said anything to me until you told me that day that, you know, we need to know what happened.

NELSON:  Right.

TERESA:  You know, if ---

NELSON: There could have been a fight, -- I mean ---

TERESA:  Right.

NELSON:  He could have been taunting him, I mean ----

TERESA:  Exactly. ----- On something and he can ask questions ---- I told her from the very beginning.  I was wondering if Steve didn't --- okay, Steve and I quit dating in December of 1994.  Okay?

NELSON:  Okay.

TERESA:  Don and I, we – when I came back in September of 1994, we had split up.  I moved back in with mom and dad.  He ----- you know what I am saying.

NELSON:  Right.

TERESA:  So he was dating people.  Well Steve, like I said, we had known for years, god years, I never would go out with him because he was Judy's friend --- well I started going out ----- and we started kind of going out, hanging out.

NELSON:  Right.

NELSON:  Oh absolutely, I want to know.

TERESA:  You know all along I'm thinking premeditated murder and then he said, he said that day, he said, you know, we don't know what happened.  That's why we want to talk to him.  You know, a fight could have broke out.

NELSON:  Right.  There could be, there could've been a fight, I mean –

TERESA:  Right.

NELSON:  He could've been taunting him, I mean –

TERESA:  Exactly.  And I'll tell you another thing.  I got a bad feeling about something, you can ask my sister about this.  I told her from the very beginning.

NELSON:  Okay.

TERESA:  I was wondering if Steve didn't, okay, Steve and I quit dating December of 1994.

NELSON:  Okay.

TERESA:  Okay, Don and I, we, when I came back in September of 1994, we had already split up.  I moved back in with mom and dad.  He moved in with these, he moved in with two guys and they were bacheloring it.  You know what I am saying.

-23-

TERESA:  And that was it.  The end of October, Okay? ------  Well, in December I broke it off with Steve, because Steve told me he had fallen in love -----

NELSON:  In 1994?

TERESA:  Yes.  He said he had fallen in love with me but I was still in love with Don.  And I broke it off.  Okay, then we got really bad news about my niece ----

. . .

TERESA:  After that I ----- You know.  It was over.  Okay.  Somebody called Don.  I think my niece ----- and Don immediately came up.  ------- well we said heck with it and we got married in ------.  We got married ------- you know ----- how these small town rumors -----

NELSON:  Okay.

TERESA:  It is boredom.  People talk.  We worked it out ----------- Anyway Steve had ------------------ (to [sic] much static) you see what I am saying?

NELSON: Okay.  Yes I do absolutely.

TERESA:  December and that January ------

NELSON:  What – did Don always know [the child born to you both during your marriage (hereinafter "Child")] was his?

NELSON:  Right.

TERESA:  So, he was dating people.  Well, Steve, like I said, we had been friends for years.  God, years, I never would go out with him, you know, we were too good of friends.  Well, I started going down and listening to him play music, and then from there, we started, you know, going out, hanging out.

NELSON:  Right.

TERESA:  That was in, uh, the end of about October, okay?  The first of October because towards the end of September when I moved back up here.  Well, it's December that I broke it off with Steve because Steve told me he had fallen in love with me.

NELSON:  In 1994.

TERESA:  Yes, he said he had fallen in love with me but I was still in love with Don.  And I broke it off.  Okay, then we got really bad news about my niece

. . .

TERESA:  After that, I wouldn't take Steve's phone calls or anything.  Well, I did take one phone call.  But it, you know, was over.  Okay, then somebody, Misty called Don all upset and everything about what Scott [omitted] had done to my niece [omitted].

-24-

TERESA: Oh lord, yea.

NELSON: Well, then that ain't a factor.

TERESA: But Steve didn't know that. You know what I am saying?

NELSON: Did he ever know.

TERESA: ---------------- (static) Thereafter, you know, thereafter he called ------- [Child] ------------

NELSON: What did you say?

TERESA: They won't tell ---- yea, ----- give my baby a kiss and ---- I'm sorry, ---- so anyway I had never told anyone this.

NELSON: He wasn't?

TERESA: Steve – what?

NELSON: ------

TERESA: I'm sorry. He never told anyone about Steve -----

NELSON: Oh, okay.

TERESA: ---------

NELSON: Did Linda tell Don that?

TERESA: No, oh, my God no. God no.

NELSON: Right.

TERESA: And Don immediately came up. He was always very close to [my niece] which brought me and Don together. Well, we said heck with it and we got married January 21st. We got married January 21st. I got pregnant the first week of May. Soon as word got out, you know, you know this county with their mentality the smalltown-y rumor type things.

NELSON: Right.

TERESA: Gail calls it mentality, but it's just boredom.

NELSON: She calls it what?

TERESA: She calls it "mentality."

NELSON: Oh. Okay.

TERESA: But it's boredom, people talk. Well, immediately word got out, you know, that I was pregnant. You know I was 27 years old, I'm 28. I've never been pregnant in my life, never been married, so I guess it was big news, you know. Anyway, Steve had Ronnie Shelly, [*sic*] a buddy of his, start calling down there. Don had not talked to Ronnie Shelly [*sic*] in years. I mean, he moved to Georgia in 1990, 1991. He had not talked to Ronnie Shelley in years. And, I knew that night Ronnie Shelley called, you know, asking if I was pregnant, when I was due, blah, blah, blah. I knew

NELSON:  You don't reckon Steve told him do you?

TERESA:  That is what I'm afraid of. That is my point.  See I don't ---------- forced him to tell ------

NELSON:  Right.

TERESA:  And you know, ------ say something to Don about it. ------------------------- (static)

. . .

NELSON:  Teresa, the state—when he told you that he shot him, did he say any other reason other than he was taunting him about you?

TERESA:  He didn't tell me all about it.  He -------------

NELSON:  But he just said that he was taunting him.  Did he ever say what he shot him with?

TERESA:  No.

. . .

TERESA:  ------- When he said that Steve was taunting him that night, you know he ---------- my mind ---------

NELSON:  Well, was Don rational when he told you that, I mean sincere like husband and wife talking?

immediately that Steve had put him up to calling because he probably thought it was his kid.  I was pregnant by him.

NELSON:  Okay.

TERESA:  You see what I am saying?

NELSON:  Yes I do, absolutely.

TERESA:  You got December and then January.

NELSON:  Did Don always know [Child] was his?

TERESA:  Oh lord, yeah.

NELSON:  Well yeah, so that ain't even a factor.

TERESA:  But Steve did not know that.  Steve didn't know.  You know what I'm saying?

NELSON:  Did he ever know?

TERESA:  I didn't see Steve up until we moved back up here last year.  I went four and a half years from my breakup with Steve, Steve had never seen me while I was pregnant, he never seen me for all those years till we moved back.

NELSON:  Right.

TERESA:  And, uh, so thereafter, then, you know, thereafter, uh, he called

TERESA: Oh yea, oh yea, he was total – yeah. Oh yes, No ----------

NELSON: Right, so he was sincere?

TERESA: Yes.

. . .

TERESA: I think that when he says taunt ------- you know, I cannot see Don doing it ------------ you know ----

NELSON: Right, right.

TERESA: He does a lot ---------- (static) and you know—him and that girl was partying it up ---------- you know --------- taunt him. ----and they got into it, you know what I am saying-------

NELSON: Right.

[unintelligible] [Child] was born. [Inaudible].

NELSON: What'd they say?

TERESA: They won't let me come there. I'm waiting. Yeah, if it's. Yeah, I'm waiting. Give my baby a kiss and tell him mommy will be home in a few minutes. I'm sorry, that was my nephew.

NELSON: That's fine.

TERESA: Um, so anyway, I had never told anyone this.

NELSON: He wasn't?

TERESA: Steve. What?

NELSON: You lost me.

TERESA: I'm sorry. I have never told anyone this, about Steve's suspicions.

NELSON: Oh, okay.

TERESA: You know what I'm saying?

NELSON: Did you ever tell Don that?

TERESA: No, my God no. God no.

NELSON: You don't reckon Steve told him, do you?

TERESA: That's what I'm afraid of, that's my point of all this. See I told Gina back before we first, not long

-27-

after we broke up, well wait a minute (inaudible). Before Steve (inaudible), I told her about all of this.

NELSON: Right.

TERESA: And, uh, you know I told her, you know, I was scared to death that, you know, Steve would say something to Don about it. I was terrified that, you know, but Don, I mean, he didn't look at Don's baby, I mean [Child] may not look like Don now, but you can look at Don's baby pictures and [Child].

. . .

NELSON: Teresa, the statement, when he told you that he shot him did he say any other reason other than he was taunting him about you?

TERESA: He didn't tell me about it. He said he'd eventually tell me all about it.

NELSON: But he just said that he was taunting him. Did he ever say what he shot him with?

TERESA: No, no.

. . .

TERESA: You know when he said that Steve was taunting him that night, you know I just can't get it out of my mind that maybe Steve said something to him about [Child].

NELSON: Well, was Don rational when he told you that, I mean sincere like husband and wife talking?

TERESA: Oh yeah, oh yeah, he was total – yeah. Oh yeah. I mean (inaudible) you know.

NELSON: Right, so he was sincere?

TERESA: Yeah.

. . .

TERESA: I think, I think something happened that night, Doug.

NELSON: Okay, and I –

TERESA: I think that, you know when he said taunt I got to thinking, you know, I cannot see Don doing it just because of me.

NELSON: Right.

TERESA: You know.

NELSON: Right.

TERESA: Because, I mean, we've been through a lot since we were fourteen, and then it dawned on me, [Child]. It had to have something to do with [Child]. Has to, you know. Because everybody, you know, has already been told about how he told Gina how Steve had bags and bags of pills that night, and you know, him and that girl were just partying it up.

-29-

NELSON: Right.

TERESA: I mean, you know, I can see Steve being brave enough, you know, to taunt him in that manner if they got into it. You know what I mean, and then get brave enough to say something like that. Had to have been, had to have been.

With that in mind, we return now to Donald's contentions about the materiality of the discrepancies between the Commonwealth's transcript and the audio recording of Teresa's interview. As explained below, he has identified nothing "material." Regarding his first point, while Teresa was uncertain that she was quoting the exact substance of what Donald related to her on October 7, 1999 – something she echoed in her trial testimony – nothing in the audio recording of Teresa's interview reasonably suggests that Donald's purported murder confession was something Teresa adopted from Det. Nelson. At all times, she indicated the substance of Donald's confession originated from Donald.

Regarding his second point, Donald and his counsel were aware, well before trial, that Teresa had given prior interviews to Det. Nelson on October 8 and 10, 1999; and that in both of those prior interviews, Teresa had made no mention of Donald's purported October 7, 1999 murder confession. Indeed, their *awareness* of that fact is not even a point of dispute: Donald and his counsel received transcripts of those prior interviews during discovery.

Rather, the upshot of Donald's argument is that something in the Commonwealth's transcript of Teresa's November 11, 1999 interview improperly dissuaded his counsel from *pressing* that fact for impeachment purposes. To that end, Donald focuses upon the following discrepancies between the Commonwealth's transcript and the audio recording of Teresa's interview:

Commonwealth's Transcript:

NELSON: Okay. And that is ---- did you tell me earlier about something he said, he would never look at your naked body again or something like that ---

TERESA: He ------ something to that. He added that -------- remember word for word but it was something, you know, but then again, ---- I may have ------ *shot for even telling that*.

NELSON: Well, I can understand that.

Audio Recording:

NELSON: And that's, that's. Did you tell me earlier about something he said, he would never look at your naked body again or something like that?

TERESA: It was something to that, yes. But, those were not the exact, remember I told you I can't remember word for word. But, it was something.

NELSON: Right.

TERESA: You know, but then again, you know, I may have screwed it up. I was *in shock that he was sitting there telling me that*, you know.

NELSON: Well, I can understand that.

(Emphasis added.)

As it goes, Donald's argument is that his counsel must have read the phrase, "shot for even telling that," as set forth in the Commonwealth's transcript, and inferred from that statement that Teresa must have indicated during her interview that Donald had threatened to *shoot* her if she *told* anyone about the

-31-

substance of his confession. Continuing that line of reasoning, Donald believes his counsel must have found that statement so distressing that it effectively dissuaded his counsel from verifying that "inference" by either listening to the audio recording of the interview or by simply interviewing Teresa on his own about it. Thereafter, his counsel must have believed that *if* he attempted to impeach Teresa regarding why she had not divulged Donald's confession during her earlier interviews, *then* the "shot for even telling that" statement set forth in the Commonwealth's transcript would be introduced as damaging rebuttal evidence to explain her delay.

Donald's argument lacks merit for a variety of reasons, but we will focus upon the two most glaring: (1) it is founded entirely upon his own chain-of-inference speculation; and (2) it fundamentally misunderstands our rules of evidence. Relative to that latter point, the Commonwealth's transcript was not itself evidence; it was merely the Commonwealth's own unauthenticated interpretation of *other* evidence. If there had ever been any kind of dispute over what Teresa *actually* stated during her interview, the dispute would have been properly resolved by permitting the factfinder to review the audio recording itself. *See* KRE 1008(c). If the original recording of the interview produced in pretrial discovery in 2000 was as clear as the one currently of record, it would have revealed Teresa said "*in shock that he was sitting there telling me that*," not "*shot*

-32-

*for even telling that.*"  Conversely, if the original recording of that statement was as garbled as the Commonwealth interpreted it to be, then what Teresa said on this point would have lacked any cognizable evidentiary value.

Donald's third and final point is his assertion that if his counsel had reviewed the audio recording of Teresa's November 11, 1999 interview, rather than the Commonwealth's transcript, his counsel would have been encouraged to impeach Teresa by asking her if she believed that doubts regarding the paternity of the child she shared with Donald, rather than sexual jealousy, might possibly have motivated Donald to kill Richmond.

We disagree.  While the audio recording of the interview certainly contains more detail about Teresa's belief in that regard, the Commonwealth's transcript also included enough of those details indicating her belief.  Teresa's *belief* was also irrelevant speculation on her part; in both the Commonwealth's transcript and the audio recording, Teresa clearly indicated Donald never told her what Steve had "taunted" him about, only that it was about her prior relationship with Steve.  More to the point, while Donald had a right – and exercised that right – not to incriminate himself by testifying about that or any other matter at his trial, he certainly would have already had notice of his own motives; and Donald does not explain what advantage, if any, he would have obtained if his counsel had

pursued that line of "impeachment." At trial, his defense theory was not about *why*

he might have killed Richmond; it was that he did *not* kill Richmond.

Considering what is set forth above, we agree with the circuit court's

conclusion that what Donald presented in support of his CR 60.02 motion was not

material and caused him no undue prejudice. To quote the circuit court's

dispositive order:

> Looking at the record and the testimony as a whole, in addition to the specific testimony of Teresa Lynch, the Commonwealth presented evidence that Steven Richmond had previously been in a relationship with Teresa Lynch, Defendant's wife; that the Defendant's jealousy led to Defendant and his wife getting a divorce; that the Defendant invited Steven Richmond to live with the Defendant; that Steven Richmond was last seen alive in the Defendant's residence alone with the Defendant; that the Defendant, after claiming that he found Steven Richmond already dead in the Defendant's residence, disposed of the body and bloody mattress; that the Defendant repeatedly lied to investigators; and that Defendant shaved and dyed his hair and fled from Pulaski County, Kentucky to California. The Commonwealth also provided the testimony from Steven Richmond's girlfriend, the last person to see Richmond alive, who stated that she left Steve Richmond alone with the Defendant.
>
> The testimony of Teresa Lynch was just one of many pieces of evidence the Commonwealth used in support of its case. If the defense had the "complete" transcript of Teresa Lynch's interview and had used it to impeach her testimony during trial, in this Court's view there is no reasonable probability that, had this evidence been disclosed, the result of the trial would have changed.

. . .

In considering the entire case, the Defendant is unable to show this Court, per *Brady*, that the government withheld evidence from the Defendant. Even if clearer tapes had been provided to defense counsel, this Court cannot say that there is a reasonable probability that the result of the proceeding would have been any different for the Defendant. Under these circumstances, there was no prejudice to the Defendant. Without prejudice to the Defendant, the Court cannot find the Defendant is entitled to relief ("extraordinary relief") from his final judgment pursuant to CR 60.02(f).

## CONCLUSION

We AFFIRM the Pulaski Circuit Court's order denying Donald Lynch's CR 60.02 motion.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Donald Lynch, *pro se* | Russell Coleman |
| Beattyville, Kentucky | Attorney General of Kentucky |
| | |
| | Sarah N. Christensen |
| | Assistant Solicitor General |
| | Frankfort, Kentucky |